[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14481

_____

D.C. Docket No. 1:09-cv-01333-JOF

SOLOMON SIMS, JR.,

Plaintiff-Appellant,

versus

MVM, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 17, 2013)

Before DUBINA, Chief Judge, CARNES and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This is an Age Discrimination in Employment Act of 1967 ("ADEA") case. See 29 U.S.C. §621 et seq. Solomon Sims, Jr., claims that his former employer, MVM, Inc., discriminated against him on account of his age when it terminated his employment. MVM defended its decision by denying that Sims' age, 71, was the reason for his discharge; rather, he was separated due to a reduction in force ("RIF").

Following discovery, the district court granted MVM summary judgment, concluding that no reasonable fact finder could find that MVM's decision was "but-for" his age, i.e., that MVM would have kept him on the job but-for his age. Sims now appeals, contending that material issues of fact preclude summary judgment.[1] After thorough review of the record and with the benefit of oral argument, we affirm.[2]

I.

---

[1] Sims also contends that the district court erred in granting MVM's motion to exclude the affidavit of B.J. Schultz. As it turned out, the district court judge considered the affidavit and concluded that it did not change his opinion of the case. We agree. Schultz merely corroborates Sims' testimony concerning discriminatory animus on the part of Davis.

[2] We review a trial court's grant of a motion for summary judgment *de novo*, viewing the record and drawing all reasonable inferences in the light most favorable to the non-moving party. HR Acquisition I Corp. v. Twin City Fire Ins. Co., 547 F.3d 1309, 1313-14 (11th Cir. 2008). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

2

In November 2007, MVM contracted with The GEO Group, Inc., to provide secure custody and transport services for federal prisoners in U.S. Marshals Service custody that were being held by GEO at various detention centers around Atlanta, Georgia.  It was a start-up contract, meaning that a previous contract did not exist.  Thus, MVM had to acquire a workforce.  MVM began performance of the contract in February 2008.  Arnold Perkins, who had come aboard in January 2008, became Project Manager.  Tom Davis was hired as Assistant Project Manager about the same time as Perkins.

Shortly after MVM entered into the contract with GEO, Sims applied for a job with MVM as Operations Supervisor.  On December 7, 2007, he was offered and accepted the supervisory position at the Robert A. Deyton Detention Facility in Lovejoy, Georgia.  He reported for work in January 2008.

As Operations Supervisor, Sims was responsible for reviewing government manifest and remand documentation and utilizing information they provided to make the arrangements and prepare the paperwork necessary for the transportation of prisoners between different locations.  Davis was Sims' immediate supervisor. In time, Davis found Sims' performance deficient in that he made more errors than other supervisors working on the MVM-GEO contract.  In Davis's view, Sims never improved his performance or fully grasped his job duties.

3

When Perkins became Project Manager, the contract was approximately $485,000 over budget for 2008 due to excessive hiring and costs entailed in training new hires. In March 2008, MVM Vice President Robert Matthews, Perkins' supervisor, notified Perkins that he needed to reduce the number of supervisors, eight, working on the contract. Perkins disagreed with Matthews's assessment and delayed taking any action. On Thursday, August 7, 2008, Matthews instructed Perkins to cut two positions by the following Monday. Perkins immediately scheduled a group meeting with all eight supervisors and Davis. During the meeting, he informed them of Matthews's RIF directive that two supervisor positions had to be eliminated. After this group meeting, Perkins and Davis met with the supervisors individually to advise them of their RIF status. Perkins advised Schultz and Sims during the individual meetings that they were to be included in the RIF.

Perkins could not testify precisely as to when he finalized his decision on whom to include in the RIF because he had known for five months that he probably would have to lay off some supervisors and had been constantly evaluating the poorer performers. However, it is clear that he had reached at least a tentative decision – during his five-month evaluations and before the meetings with the supervisors and Davis – that Sims was at the bottom of the list in terms of

4

performance.  One of Perkins' jobs was to review every "mission" that was put together, and each mission contained the names of the supervisors that prepared them.  In the course of going through each mission, Perkins knew which supervisors were having trouble preparing them and which were not.  Based on Perkins' personal observations, Sims was at the bottom of the list in terms of, among other factors, total quality and accuracy.  In addition, Perkins personally observed that Sims was uncomfortable using the computers used to produce the transportation documentation and that it was taking him longer to prepare these documents than the other supervisors.  Other supervisors also told Perkins that they were occasionally correcting Sims' documentation before it was submitted to Perkins for review.  Some of the supervisors cited this concern during their individual meetings with Perkins and Davis on Friday, August 8.

During the individual meetings between the supervisors and Davis and Perkins, Perkins asked the supervisors whom they would recommend for the RIF.  Perkins testified that this was just for his knowledge and perspective because his RIF decisions had already been made.  On the other hand, based on the fact that Perkins asked each of the eight supervisors for their input before announcing his decision, Davis was of the opinion that Perkins had not made a definitive decision

5

until after seeking input from the supervisors.  Nonetheless, it is undisputed that each supervisor except Sims recommended that Sims be included in the RIF.

After notifying Sims that he was included in the RIF, Perkins offered Sims a position as Transportation Officer working at the same facility;[3] Perkins believed that Sims' background education and knowledge would be valuable to MVM. Sims considered the offer a demotion and rejected it.  During this conversation, the matter of Sims' age came up, but the parties dispute who first brought it up. However, it is clear that Sims told Perkins his age toward the end of the conversation.

In the charge of age discrimination he filed with the Equal Employment Opportunity Commission ("EEOC"), Sims identified the period of discrimination as May 15, 2008, through August 8, 2008.  He alleged that Davis (at some point during that time span) told him that he was "too slow in performing [his] job," that, "If we have a cutback in management, I'm going to recommend you be terminated," and, "mind you, age has nothing to do with it."  Although not included in his EEOC charge, Sims also asserts now that Davis at some unknown time stated, "You're old and slow."  Sims does not assert that Davis made any other age-related comments that he felt were derogatory.  The EEOC charge

---

[3]    Perkins also offered Schultz a position as a Transportation Officer; she declined.

6

contained no other allegations aside from Perkins' statement (on August 8) that MVM needed to "cut back on the number of supervisors." Sims never heard any other manager make a derogatory age-related comment to him or about him.

## II.

The ADEA prohibits employers from discharging an employee who is at least 40 years of age because of that employee's age. 29 U.S.C. §§623(a)(1), 631(a). The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." Id. §623(a)(1). In Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176, 129 S. Ct. 2343, 2350, 174 L. Ed. 2d 119 (2009), the Supreme Court held that the language "because of" in the ADEA statute means that a plaintiff must prove that discrimination was the "but-for" cause of the adverse employment action. See id. ("To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."); see also id. (explaining that the claim "cannot succeed unless the employee's protected trait actually played a role in [the employer's decision-making] process *and had a determinative influence on the outcome*" (citing Hazen

7

Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S. Ct. 1701, 1706 (1993)); W.

Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on Law of Torts

265 (5th ed. 1984) ("An act or omission is not regarded as a cause of an event if

the particular event would have occurred without it.").

A plaintiff can establish age discrimination through either direct or

circumstantial evidence. Mora v. Jackson Mem'l Found., Inc., 597 F.3d 1201,

1204 (11th Cir. 2010). Prior to Gross, we consistently evaluated ADEA claims

based on circumstantial evidence of discrimination under the burden-shifting

framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817

(1973). See, e.g., Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000)

(en banc). Under this framework, a plaintiff must first establish a prima facie case

of discrimination. Id. at 1024. Next, the defendant must articulate a legitimate,

non-discriminatory reason for the challenged employment action. Id. If the

defendant articulates one or more such reasons, the plaintiff is afforded an

opportunity to show that the employer's stated reason is a pretext for

discrimination. See Kragor v. Takeda Pharm. Am., Inc., __ F.3d __, No. 11-

16052, 2012 WL 6618360, at *2 (11th Cir. Dec. 20, 2012) (citing Reeves v.

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 2106

(2000); McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. at 1925). The burden of

persuasion always remains on the plaintiff in an ADEA case to proffer evidence sufficient to permit a reasonable fact finder to conclude that the discriminatory animus was the "but-for" cause of the adverse employment action. See Gross, 557 U.S. at 176, 129 S.Ct. at 2350.

Following Gross, we have continued to evaluate ADEA claims based on circumstantial evidence under the McDonnell Douglas framework. See Kragor, __ F.3d at __, 2012 WL 6618360, at *2. This is not only consistent with our pre-Gross case law, but also it is entirely consistent with Gross, which expressly left open the question of whether this application is appropriate. Gross, 557 U.S. at 175 n.2, 129 S. Ct. at 2349 n.2 ("[T]he Court has not definitively decided whether the evidentiary framework of [McDonnell Douglas] utilized in Title VII cases is appropriate in the ADEA context."). Gross held that it is improper to shift the burden of *persuasion* to the defendant in an age-discrimination case. Id. at 173, 129 S. Ct. at 2348 ("[W]e must first determine whether the burden of persuasion ever shifts to the party defending an alleged mixed-motives discrimination claim brought under the ADEA. We hold that it does not." (footnote omitted)). But the McDonnell Douglas framework does not shift the burden of persuasion to the defendant; instead, once the employee establishes a prima facie case of discrimination, the burden of *production* is shifted to the employer to articulate a

9

legitimate, non-discriminatory reason for the adverse employment action.  See

Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089,

1094-95 (1981).  If the employer offers a legitimate, non-discriminatory reason,

the employee is afforded an opportunity to show that the employer's stated reason

is a pretext for discrimination.  See id. at 256, 101 S.Ct. at 1095; see also Kragor,

__ F.3d at __, 2012 WL 6618360, at *2.  Importantly, throughout this entire

process, the ultimate burden of persuasion remains on the employee.  See St.

Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 2747 (1993)

("It is important to note, however, that although the McDonnell-Douglas

presumption shifts the burden of production to the defendant, '[t]he ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated

against remains at all times with the plaintiff.'") (citation omitted); see also Willis

v. Conopco, Inc., 108 F.3d 282, 286 (11th Cir. 1997).

Our continued application of the McDonnell Douglas framework in ADEA

cases is also consistent with all of our sister circuits that have addressed the issue.

See Fleishman v. Cont'l Cas. Co., 698 F.3d 598, 604 (7th Cir. 2012) (citing

Senske v. Sybase, 588 F.3d 501, 506-07 (7th Cir. 2009)); Shelley v. Geren, 666

F.3d 599, 607 (9th Cir. 2012); Gorzynski v. JetBlue Airways Corp., 596 F.3d 93,

106 (2d Cir. 2010); Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 378

10

(5th Cir. 2010); Jones v. Okla. City Pub. Sch., 617 F.3d 1273, 1278 (10th Cir. 2010); Geiger v. Tower Auto., 579 F.3d 614, 622 (6th Cir. 2009); Smith v. City of Allentown, 589 F.3d 684, 690-91 (3d Cir. 2009); Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 446-47 (1st Cir. 2009); see also Gibson v. Am. Greetings Corp., 670 F.3d 844, 855 (8th Cir. 2012) (continuing to apply McDonnell Douglas to ADEA cases without discussion of Gross), cert. denied, 133 S.Ct. 313 (2012).

Although our Kragor decision and our holding today reaffirm the use of the McDonnell Douglas framework in ADEA cases, this framework is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case.  See Smith v. Lockheed Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  Instead, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Id.  A triable issue of fact exists "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  Id. (footnote omitted) (internal quotation marks omitted).

11

III.

This case involves circumstantial evidence of discrimination,[4] and we elect to apply the McDonnell Douglas framework to Sims' claims. The record in this case is clear that Perkins was the decision-maker. Sims makes two arguments on appeal. First, he argues that Perkins himself was biased. Second, he argues that Davis was biased and that Perkins acted as a mere cat's paw for Davis's discriminatory animus.

A.

Sims first argues that a reasonable jury could find that Perkins himself was biased and that his age discrimination was the "but-for" factor in Perkins' decision to lay off Sims. We disagree.

Assuming *arguendo*, as the district court did, that Sims has established a prima facie case of age discrimination in an RIF claim, Sims cannot sustain his burden of proving that Perkins' age discrimination was the "but-for" cause of his

---

[4]    MVM points out that Sims never directly argues that this is a case involving direct evidence of discrimination. This is true, and the only "argument" Sims makes that there is direct evidence of discrimination is one heading titled "direct evidence" in his briefs to this Court. But, even assuming that this is enough to "argue" that any evidence is direct evidence, direct evidence must conclusively show that the employee was discriminated against without any inference or presumption. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004). Under the heading for "direct evidence," Sims states that "[s]uch an unsolicited age-based statement creates an *inference* of discrimination." Sims has not presented any direct evidence of discrimination.

12

inclusion in the RIF.  MVM clearly articulates legitimate, non-discriminatory reasons for Sims' inclusion in the RIF – namely, that budget constraints forced it to eliminate two supervisor positions.  See, e.g., Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995) (holding that an RIF based on budgetary constraints was a legitimate, non-discriminatory reason for termination).

There is very little, if any, evidence of pretext.  There is virtually no evidence of age bias on the part of Perkins, who was 61 himself at the time.[5] Perkins testified that, after he advised Sims that his position had to be eliminated and offered Sims a position as Transportation Officer, Sims rejected the offer and asked if his inclusion in the RIF was because of his age.  Perkins said it was not; he told Sims that he was unaware of Sims' age and that he was the oldest person working on the project.  In reply, Sims told Perkins he was born in 1937 and that he (Sims) was in fact the oldest on the project.  Contrary to Perkins' testimony, Sims testified that it was Perkins who, after advising Sims of the RIF, first brought up age, saying out of the blue, "I'm older than you."  Sims urges us to draw an

---

[5]    In fact, Sims himself testified that he is not aware of any evidence that Perkins selected him for the RIF because of his age.

13

inference of age bias based on the fact that Perkins followed his bad news with a denial of knowledge of Sims' age.

Even assuming Sims' version of who first mentioned age, we are doubtful that that gives rise to a reasonable inference of age bias. Even if there were a weak inference, it would be further weakened in light of Sims' own testimony that Perkins expressed surprise after Sims told him that he (Sims) was 71, and in light of Sims' deposition testimony that he was aware of no evidence that Perkins selected him for the RIF because of his age. We conclude that the record reveals either no evidence at all of age bias on the part of Perkins, or an inference so weak (especially as compared to the overwhelming evidence of the legitimacy of Perkins' decision) that it would fall far short of satisfying Sims' burden of proving that age bias on the part of Perkins was the "but-for" cause of Perkins' selection of Sims. It is undisputed that Perkins' own independent evaluation was that Sims was at the bottom of the list of supervisors when comparing their relative job performance. It is also undisputed that every supervisor other than Sims himself thought Sims was one of the two who should be laid off. In sum, the weak or nonexistent inference of age bias urged by Sims simply cannot carry Sims' burden in light of the record evidence.

14

B.

Sims also argues that Perkins, the decision-maker, acted as a mere cat's paw for Davis's discriminatory animus, and accordingly MVM is liable.[6]  Prior to the recent Supreme Court decision in Staub v. Proctor Hospital, __ U.S. __, 131 S.Ct. 1190 (2011), we applied the cat's paw analysis to ADEA cases.  See, e.g., Wright v. Southland Corp., 187 F.3d 1287, 1304 n.20 (11th Cir. 1999);  Pennington v. City of Huntsville, 261 F.3d 1262, 1270 (11th Cir. 2001); Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331 (11th Cir. 1999) (Title VII case).

Sims argues that the Supreme Court's decision in Staub modifies our previous case law applying the cat's paw theory and lowers the burden for plaintiffs in cases involving the ADEA.  This is an issue of first impression for this Court.  We consider whether, or to what extent, Staub has modified our cat's paw analysis in ADEA cases.

We first examine the Supreme Court's recent Staub decision.  In the context of an employer's alleged liability under the Uniformed Services Employment and

---

[6]    "Cat's paw" theory of liability, also referred to as "subordinate bias theory," is liability seeking to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.  Staub v. Proctor Hosp., __ U.S. __, 131 S.Ct. 1186, 1190 (2011).  For an explanation of how the term "cat's paw" was derived, see id. at 1190 n.1.

15

Reemployment Rights Act of 1994 ("USERRA"),[7] the Court defined the circumstances under which an employer could be liable when the decision-maker has no discriminatory animus but is influenced by a subordinate supervisor's action that is the product of such discriminatory animus (cat's paw liability).  The Court held that the employer could be liable only if the subordinate supervisor (1) performs an act motivated by antimilitary animus that is intended to cause an adverse employment action, and (2) that act is a proximate cause of the ultimate employment action.  Staub, __ U.S. at __, 131 S.Ct. at 1194.

Sims urges us to apply this analysis to this case.  But the text of the USERRA and the ADEA differ in important respects.  The USERRA (and Title VII)[8] requires that a plaintiff demonstrate discrimination by showing that the proscribed bias was a "motivating factor" in the adverse decision.  38 U.S.C. §4311(c) (USERRA); 42 U.S.C. §§2000e-2(m), 2000e-5(g)(2)(B) (Title VII).  As the Court in Staub emphasized, this "motivating factor" causation standard is simply the traditional tort law standard of proximate cause, requiring only "some

---

[7]    The USERRA prohibits adverse employment action on the basis of a person's obligation to perform military service where antimilitary animus is a motivating factor in the employer's action.  38 U.S.C. §4311(a), (c).

[8]    Although the Supreme Court did not directly extend its holding in Staub to Title VII cases, it acknowledged that "[t]he [USERRA] statute is very similar to Title VII."  Staub, __ U.S. at __, 131 S.Ct. at 1189.

16

direct relation between the injury asserted and the injurious conduct alleged, and excludes only those link[s] that are too remote, purely contingent, or indirect." __ U.S. at __, 131 S.Ct. at 1192 (internal quotation marks omitted).  By contrast, the ADEA states that it is unlawful if an employee suffers adverse employment action "*because of* such individual's age."  29 U.S.C. §623(a)(1) (emphasis added).  Thus, "to establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  Gross, 557 U.S. at 176, 129 S.Ct. at 2350.  As noted above, a "but-for" cause requires a closer link than mere proximate causation; it requires that the proscribed animus have a determinative influence on the employer's adverse decision.  Id.

As the Supreme Court cautions, "we 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'"  Id. at 174, 129 S.Ct. at 2349 (quoting Fed. Exp. Corp. v. Holowecki, 552 U.S. 389, 393, 128 S Ct. 1147, 1153 (2008)).  And the ADEA requires more than what must ordinarily be proven under an analogous Title VII or USERRA action.[9]  See Simmons v. Sykes Enters., Inc., 647 F.3d 943, 949-50 ("If

---

[9]    Congress amended Title VII in 1991, adding that the discriminatory animus must be the "motivating factor" of the adverse action.  42 U.S.C. §2000e–2(m); see also Gross, 557 U.S. at 174, 129 S.Ct. at 2349.  But, even though it contemporaneously amended the ADEA in several ways, Congress did not add such a provision to the ADEA.  Gross, 557 U.S. at 174, 129

17

we were to apply Staub directly to an age-discrimination case, the plaintiff would then only need to prove her supervisor's animus was somehow related to the termination and not that the animus was necessary to bring about the termination."). Because the ADEA requires a "but-for" link between the discriminatory animus and the adverse employment action as opposed to showing that the animus was a "motivating factor" in the adverse employment decision, we hold that Staub's "proximate causation" standard does not apply to cat's paw cases involving age discrimination. In so holding, we follow the same holding by the Tenth Circuit in Simmons, 647 F.3d at 949-50.

However, Staub is primarily a case about agency principles and vicarious liability, and nothing in Gross is inconsistent with the application of agency principles to cat's paw claims under the ADEA. All relevant case law, including our own prior case law applying the cat's paw theory in ADEA cases and the Court's decision in Staub, suggests that it is appropriate to apply agency principles in determining vicarious liability of an employer. We have, for example, applied agency principles to determine the definition of an "employer" under the ADEA. See, e.g., Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A., 104 F.3d 1256,

S. Ct. at 2349. As the Court indicated in Gross, "[w]hen Congress amends one statutory provision but not another, it is presumed to have acted intentionally." Id. (citing EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 256, 111 S.Ct. 1227, 1234 (1991)).

18

1266-67 (11th Cir. 1997); Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1495-96 (11th Cir. 1993).

Sims urges us to apply Staub's agency principles as they relate to scienter, and suggests that the Supreme Court in Staub set forth agency principles that constitute a lower burden for plaintiffs in establishing cat's paw, vicarious employer liability, as compared to our prior ADEA case law. However, in this case we need not, and do not, decide whether Staub changes in any way our prior cat's paw ADEA cases with respect to agency principles as they relate to scienter, because we can accept Sims' invitation and assume *arguendo* that the Staub standard with respect to such agency principles does apply in the analysis for determining an employer's vicarious liability in ADEA cases. Even with this assumption, Sims cannot prevail because Sims cannot satisfy the required causation standard. In other words, with respect to agency principles relevant to the scienter element, we can assume *arguendo* that Sims must prove only Staub's agency standard (i.e., that Davis performed an act motivated by discriminatory animus that Davis intended to cause Sims' lay off),[10] and we can assume *arguendo*

---

[10]    The Court in Staub left open the issue of whether the biased supervisor must intend the precise adverse employment action that resulted or whether it would suffice to have intended an adverse, though different, employment action. See Staub, __ U.S. at __, 131 S.Ct. at 1192 n.2. Here, it is clear that Davis recommended that Sims be laid off and intended that Sims be laid off.

19

that Sims has satisfied such proof.  However, as noted above, an ADEA plaintiff

must prove "but-for" causation – not mere proximate causation.  Thus, to prevail,

Sims must prove that Davis's animus was a "but-for" cause of, or a determinative

influence on, Perkins' ultimate decision.  For the reasons set out below, Sims

cannot satisfy this causation standard.

Assuming *arguendo* that a reasonable juror could find, as set forth in the

Staub analysis, that Davis was motivated by discriminatory animus that was

intended to cause Sims' lay off,[11] we hold that a reasonable juror could not

conclude that Davis's animus was a "but-for" cause of Sims' termination.  First,

Perkins testified that, because he had been aware for approximately five months

that he could not indefinitely put off the RIF, he had been constantly evaluating

the supervisors and their relative performance.  Second, he testified unequivocally

that the decision was his own decision based on his own observations and

evaluations.  In his opinion and based on his own personal observations, Sims was

at the bottom of the list of supervisors in terms of quality and accuracy of their

work product.  Third, although he had consulted Davis in that they had been

---

[11]     We note that the evidence of discriminatory animus is rather weak.  Sims asserts in his deposition, but not in his EEOC charge, that Davis told him at some unknown time that he was "old and slow."  In May 2008, Davis allegedly said that Sims was slower in his work and that, if there was a cutback in staff, he would recommend Sims to be terminated, but, "Mind you, age has nothing to do with it."  These are the only two instances where Sims alleges that Davis made discriminatory age-related remarks.

20

continually discussing the performance of all the supervisors, Perkins testified that Davis's opinion about Sims had been exactly the same as his own, thus merely confirming Perkins' own independent opinion.  Fourth, in the individual meetings which Perkins and Davis held with each of the eight supervisors, in which each was asked for a recommendation as to the two who should be included in the RIF, every supervisor except for Sims himself recommended that Sims should be one of the two who had to be laid off.  In sum, everyone whom Perkins consulted recommended that Sims be one of the two who had to be laid off – that is, everyone except Sims himself.  In light of Perkins' own five-month long evaluations, in light of Perkins' own independent judgment that Sims was at the bottom of the list on performance, and in light of the unanimous opinion of all persons consulted (except for Sims himself), we conclude that a reasonable juror could not find that Davis's animus was a "but-for" cause of Sims' termination.  It is clear that Davis's recommendation, even assuming *arguendo* it was tainted with some discriminatory animus, was not a "determinative influence" on Perkins' decision.  See Gross, 557 U.S. at 176, 129 S.Ct. at 2350.

21

IV.

Because Sims has not established that a reasonable juror could find that Perkins' discriminatory animus was the "but-for" cause of his termination, and because Sims has similarly not established that Perkins acted as a mere cat's paw for Davis's discriminatory animus, we affirm the district court's grant of summary judgment in favor of MVM.

AFFIRMED.