[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11637
_____

D.C. Docket No. 1:12-cv-03752-WSD

MARY GODWIN,

Plaintiff-Appellant,

versus

WELLSTAR HEALTH SYSTEM, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____
(June 17, 2015)

Before HULL, ANDERSON and FARRIS,[*] Circuit Judges.

PER CURIAM:

In this employment lawsuit, Plaintiff Mary Godwin ("Godwin") appeals the

district court's order granting summary judgment in favor of her employer,

_____
[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by
designation.

WellStar Health System, Inc. ("WellStar") on her age discrimination, disability discrimination, and retaliation claims.

Godwin's age discrimination and retaliation claims stem from her firing by WellStar. Godwin's disability discrimination claim arises from WellStar's alleged failure to accommodate Godwin's disability.

After a review of the record and the parties' briefs, and with the benefit of oral argument, we reverse the grant of summary judgment in favor of WellStar on Godwin's age discrimination claim but affirm as to all the other claims.

## I. FACTUAL BACKGROUND

In this summary-judgment posture, we review the facts in the light most favorable to Godwin.[1]

## A.    1999–March 2010: Godwin's Employment History with WellStar

Godwin began working for WellStar in 1999, when she was approximately 51 years old.[2] WellStar hired Godwin as an order puller in the company's distribution center. As an order puller, Godwin was required to identify the product that was to be distributed, put it in a box, and label it. She eventually became the lead order puller at the distribution center.

---

[1]We conclude that Godwin has not shown reversible error in the district court's grant of summary judgment on her disability and two retaliation claims. In this opinion, we focus on the record evidence regarding her age discrimination claim.

[2]Godwin was born in 1948.

2

By 2003, Godwin was promoted to the position of "buyer" in the distribution center.  As a buyer, Godwin processed orders through WellStar's computer programs, and she was responsible for part of the process by which order pullers received their orders.  For approximately six years, Godwin remained a buyer in the distribution center.

From 2003 through 2007, Godwin received mixed performance reviews for her work as a buyer.  Her reviews generally indicated that she met expectations in most categories, but that she needed improvement or failed to meet expectations in other categories.

At some point in 2007 or 2008, Godwin was transferred to the purchasing department to replace an individual who was sick.  She retained the position of buyer while in the purchasing department.

As a buyer in the purchasing department, Godwin was responsible for ordering products that went directly to the hospitals and other facilities within the WellStar system.  Godwin worked directly with certain WellStar departments; employees in those departments placed requisition orders in WellStar's computer system, and Godwin was responsible for reviewing those orders.  Once she reviewed those orders, Godwin was tasked with creating purchase orders to execute the transaction with the vendor supplying the requested product.  Errors can occur in this process if the buyer enters the information into the purchase order

3

incorrectly, which can lead to no product being ordered, the incorrect product being ordered, or the correct product being ordered in the wrong quantity or at the wrong price. Godwin also was responsible for confirming that the vendor was able to supply the product within the necessary timeframe, and confirming that WellStar actually received the correct quantity of the product ordered.

From the time Godwin was transferred to the purchasing department through March of 2010, Godwin continued to receive mixed performance reviews, which indicated that her performance hovered around meeting expectations.

On March 1, 2009, Anthony Trupiano began working for WellStar as a vice president. Trupiano was tasked with improving the overall performance of the areas under his supervision, including the purchasing department.

As part of his efforts to increase the performance of the purchasing department, Trupiano created a new position of Director of Purchasing and Contracts. In September or October of 2009, Trupiano hired Ken Tifft for this new position.

About this time, Godwin received a performance evaluation covering the period from July 1, 2008 to June 30, 2009. The evaluation, which Tifft personally observed, indicated that Godwin was generally failing to meet expectations. Godwin's direct supervisor, who conducted the performance evaluation, resigned

4

shortly thereafter.  From that point through April 2010, Godwin reported directly to Tifft.

Tifft did not feel that Godwin's former supervisor had adequate documentation to justify rating Godwin as failing to meet expectations, so he approved a three-percent merit increase for Godwin just one month later, in November 2009.  Indeed, Tifft thought that Godwin was "was not evaluated fairly or correctly" and thought that she was meeting expectations as of April 2010.  Kristen Betts, WellStar's director of human resources, conveyed Tifft's thoughts in an e-mail.  The e-mail stated, in relevant part:

> [Tifft] is concerned about Mary Godwin specifically. … Based on what [Tifft] has seen and knows about [Godwin's] performance over the last few months, he feels that she is not at that level [of not meeting expectations], and in fact she is meeting expectations, and that she was not evaluated fairly or correctly by Chris and previous management.

In addition, one of Tifft's goals was to increase the responsibilities of WellStar's buyers to align better with the company's official description of the position of buyer.  As part of this process, Tifft sought to have WellStar's buyers focus on higher-level tasks, including seeking out opportunities to achieve cost savings for WellStar.  During his review of WellStar's buyers, Tifft discovered that Godwin was being paid at a lower hourly rate than other buyers and thus approved a raise for Godwin from $13.92 per hour to $18.51 per hour.

5

In March of 2010, Tifft conducted a mid-year performance review of Godwin.  Tifft rated Godwin's overall performance as slightly below meeting expectations.  Tifft expected Godwin to respond to the concerns that he raised about her performance in the evaluation.  Within about a month, Tifft had seen some evidence of her efforts in that regard, and he felt that it was fair to say at that point that Godwin was meeting expectations.

## B.    April 2010: Cherise Brown Becomes Godwin's Supervisor

In April 2010, WellStar hired Cherise Brown as the purchasing department manager.  In that role, Brown replaced Tifft as Godwin's direct manager.  At that time, Tifft thought Godwin was meeting expectations.

Brown was tasked with improving the performance of employees in the purchasing department and building their skill sets so they would be able to complete more robust tasks, which were set forth in their job descriptions.  Brown was a very demanding manager, and her management style was different from the styles of Godwin's previous managers.

## C.    September 2010-December 2010: Brown Places Godwin on First PIP

On September 8, 2010, about five months after arriving at WellStar, Brown placed Godwin on a 90-day performance improvement plan (a "PIP").  The PIP identified several deficiencies in Godwin's performance, including (1) making errors on purchase orders, (2) engaging in little or no follow-up with internal

6

customers, and (3) taking too many breaks.  Godwin, however, disputes that she made more purchase order errors than other buyers.

On October 8, 2010, Brown presented Godwin with a 30-day follow-up to the PIP.  The 30-day follow-up noted (1) that the frequency of Godwin's breaks had decreased; (2) that, although Godwin had improved her rate of escalating sensitive issues, mistakes with key customers continued to occur; and (3) that Godwin's customer complaints were high, and issues were going unaddressed or unresolved.

On November 8, 2010, Brown presented Godwin with a 60-day follow-up to the PIP.  The 60-day follow-up noted (1) that Brown continued to have concerns about Godwin's communication and prompt escalation of important matters; (2) that Godwin must continue to focus on "understanding current processes and communicating directly with customers[,] specifically on the vendor certification process"; (3) that Godwin had maintained a lower frequency of breaks; and (4) that "[t]he next 30 days will be critical to determining if [Godwin] will complete the PIP in good standing."

Although Brown had indicated in the 60-day follow-up that the ensuing 30 days would be critical, she never completed a 90-day follow-up in December of 2010.  Instead, Brown decided to reserve any discussion until Godwin's mid-year evaluation.

7

**D.    January 2011-February 2011: Brown Evaluates Godwin and Places Her on Second PIP**

In January or February 2011, Brown completed Godwin's mid-year evaluation.  In this evaluation, Godwin received an overall rating of 2.63 out of 5.00, which reflected that she was not meeting expectations.  However, Brown stated that Godwin had "a willingness to correct poor performance."

On February 22, 2011, Brown placed Godwin on a second PIP.[3]  In this second PIP, Brown stated that Godwin's performance suffered from the following deficiencies: (1) errors on purchase orders, including incorrect prices, missing notes, and errors in quantity; (2) the absence of any savings reported; (3) the lack of participation on work teams; (4) excessive time away from her desk; and (5) excessive personal use of the internet.

**E.    March 2011-May 2011: Brown Performs Follow-ups on Second PIP and Godwin Complaints to HR**

On March 28, 2011, Godwin received a 30-day follow-up to the February 2011 PIP.  In that 30-day follow-up, Brown stated (1) that Godwin's errors with purchase orders continued and reflected a lack of attention to detail; (2) that basic procedures were not being followed; (3) that Godwin had not reported any cost

---

[3]Although WellStar contends that Brown merely extended the earlier PIP for another 90 days, Godwin asserts that the first PIP expired after 90 days.  At this summary-judgment stage, we resolve this disputed factual matter in favor of Godwin.

8

savings; and (4) that a work team that Godwin led[4] had not taken certain actions. However, Brown did note in that 30-day follow-up that Godwin's personal use of the internet had decreased. Furthermore, that 30-day follow-up did not mention the earlier concern about Godwin's alleged excessive time away from her desk, which would have been documented if it had continued to be problem.

One day later, on March 29, 2011, Godwin spoke with Betts, the director of human resources. Godwin told Betts that Brown made several ageist comments. Those comments included (1) that, at Godwin's age, she should be home with her husband; (2) that Godwin should have planned for certain expenses when she was young; (3) that Godwin was not capable of "mentally understanding" her job; and (4) that Godwin should probably be home with her husband because he was ill.[5] In response, Betts told Godwin that she should tease Brown, who was about 37 years old at the time, about her young age.[6] WellStar's human resources department did not investigate Godwin's complaint.

---

[4]Godwin led the blood project product improvement team, which was tasked with looking for opportunities to save money from the blood products WellStar purchased from the American Red Cross.

[5]Godwin's husband had a serious illness in 2010 and 2011. Godwin arranged to work from 5:00 a.m. to 3:00 p.m. during this time, as someone stayed with her husband until 3:00 p.m. while she was at work.

In addition, from at least 2010 through 2011, Godwin herself suffered from rheumatoid arthritis, osteoporosis, and fibromyalgia.

[6]Betts denies that Godwin made any complaints about age discrimination at this March 29, 2011 meeting. Rather, Betts asserts that the discussion was around Godwin's concerns that

9

On May 4, 2011, Godwin received a 60-day follow-up to the February 2011 PIP.  In that 60-day follow-up, Brown stated (1) that errors with Godwin's purchase orders continued to be found and "strongly indicate no attention to detail"; (2) that Godwin failed to adhere to basic purchase-order procedures; (3) that Godwin had produced "[v]ery little savings"—only $2,600 out of a $35,000 goal; and (4) that the team Godwin led lacked leadership, as demonstrated by the fact that  a meeting had been cancelled "due to insufficient communication and insufficient stakeholder participation."  Godwin, however, disputes that her performance actually reflected the alleged deficiencies.  Brown did not make any notes about the previously identified concerns about Godwin's time away from her desk or use of the internet, and WellStar concedes that Brown would have documented these issues if they had continued to be problems.

During this meeting, Brown also informed Godwin that she would not be getting credit for savings produced by a project Godwin had been working on and that Brown decided another employee would receive the savings credit.  The employee who received the savings credit told Godwin that Brown made that decision because Brown was trying to sabotage Godwin.

Later that day, after she received the 60-day follow-up to her PIP, Godwin met with Assistant Vice President of Human Resources Mary Louise Tavernaro

she was not meeting Brown's expectations.  However, we resolve this factual dispute in Godwin's favor at this summary-judgment stage.

10

and complained about Brown making comments about her age.[7]  Tavernaro told Godwin to take the next two days off and that human resources would investigate the situation.

On May 9, 2011, Godwin met with Tavernaro and Betts, who was on vacation the day Godwin first reported Brown's comments to Tavernaro.  During the meeting, which lasted more than an hour, Godwin told Tavernaro and Betts that Brown had made several specific comments about Godwin's age.  Specifically, Godwin informed Tavernaro and Betts that Brown (1) asked Godwin how old she was, to which Godwin responded that she was 63; (2) said, after learning Godwin's age, "I would think at your age you would want to be home with your husband"; and (3) asked Godwin why she didn't plan to avoid working at her age.

Godwin also complained to Tavernaro and Betts of Brown's allegedly unfair treatment, and of Brown's directives that prevented Godwin from walking around when needed.  Godwin stated that three co-workers—Lynn Bryant, Tim Sullivan, and June Carpenter—could attest that Brown was discriminating against Godwin due to her age.

Furthermore, Godwin told Tavernaro and Betts that she worked on a project that achieved cost savings, but the savings were attributed to a younger employee.

---

[7]The record does not include the specific comments about which Godwin complained on May 4, 2011.

11

Tavernaro and Betts told Godwin not to return to work and to take off the next week so that they would have time to complete the investigation.[8]

On the same day Tavernaro and Betts interviewed Godwin, Brown concluded that Godwin should be fired. Brown created a form entitled "Performance Summary," which is not a standard WellStar form, and recommended terminating Godwin's employment. Brown made this recommendation even though Godwin's PIP was not scheduled to conclude for several more weeks. When she made this recommendation, Brown already knew that Godwin had made an age discrimination complaint about her to human resources because Tifft had informed Brown of the complaint.

On May 12, 2011, Betts interviewed Brown. In that interview, Brown admitted that she asked Godwin her age and asked Godwin why she was working "past retirement age." Brown also admitted telling Godwin that, in light of Godwin's age, Godwin would want to be home taking care of her husband. Brown told Betts that she was trying to give Godwin "options."

Tavernaro and Betts then conducted interviews of a number of WellStar employees, including Bryant and Carpenter.

On May 20, 2011, Betts interviewed Lynn Bryant, who was a contract analyst in the purchasing department. Betts's notes of the interview indicate that

---

[8]Godwin was paid for the days she was told not to return to work.

12

Bryant described gossip in the department about Brown targeting "long term employees" like Godwin. Bryant also told Betts that she thought Brown was targeting Godwin. However, Bryant said that she had never heard any manager refer to anyone as old or unable to learn new concepts. Bryant said that Godwin often came to her for help, but that Brown and Tifft had instructed her to stop helping Godwin because it was impacting the work they needed Bryant to complete. Bryant described Brown as a "bulldog" and said she did what she could to avoid working with Brown.

Three days later, on May 23, 2011, Betts interviewed Carpenter, who was a buyer in the purchasing department. Betts's notes of the interview indicate that Carpenter said that things had changed dramatically in the past year since Brown was hired as manager. Betts noted that Carpenter said she never heard Brown say anything about age but thought Brown was trying to get rid of Carpenter because of her age.[9]

On May 23, 2011, WellStar's human resources department concluded the investigation. Based on her interviews and investigations, Betts concluded that she could not "corroborate Godwin's allegation that Brown was discriminating against her or harassing her because of her age." Instead, Betts concluded that "Brown asked the question about Godwin's age only as part of a personal conversation that

_____

[9]Brown later involuntarily transferred Carpenter out of the purchasing department.

13

Godwin had initiated and with the genuine goal of being able to provide Godwin with advice as a friend on how to address the situation she was facing." However, Betts stated, after Brown asked the question, "she realized that, as Godwin's manager, she should not have engaged in that conversation because it could be misconstrued." Betts told Godwin that WellStar did not find any age discrimination.

In the weeks after Betts concluded her investigation, she had discussions with Brown about the next steps with respect to Godwin's employment.

**F.     June 2011: WellStar Terminates Godwin's Employment**

When Godwin returned to work, she was nearing the end of her second 90-day PIP. Prior to returning to work, Godwin was not issued any written discipline under WellStar's progressive discipline plan, which is distinct from the company's PIPs. Betts recommended that Brown document the status of Godwin's alleged deficiencies in a progressive discipline format.

On approximately June 1, 2011, Tifft—Godwin's direct supervisor prior to Brown's arrival and Brown's direct supervisor at the time—went on medical leave. Prior to going on leave, Tifft talked with Brown about the next steps involved in Godwin's PIP. Tifft reviewed the errors Brown identified with Godwin's purchase orders and agreed that the number and consistency of errors warranted her being placed on a PIP. Tifft knew it was possible Godwin's employment would be

14

terminated while he was on leave.  Godwin testified that Tifft said Brown "better

not" terminate Godwin before he returned from leave.[10]

On June 3, 2011, Brown issued a "First Notice and Warning that additional

infraction[s] may lead to Final Notice, Suspension or Discharge" (the "June 2011

First Notice").  In the June 2011 First Notice, Brown wrote that Godwin continued

to make the errors identified in her PIPs.  The June 2011 First Notice read, as

follows:

> [Godwin] is currently on a [second] consecutive Performance
> Improvement Plan.  Two PIP updates have been provided on the FY
> 2011 Plan (3/28/11 & 5/4/11).  At each update [Godwin] has been
> presented with data illustrating the various errors on Purchase Orders
> she issues.  The errors continue to occur.  This counseling report
> formally reflects that [Godwin] has been informed of the continued
> errors.

On June 17, 2011, Brown created another non-standard "Performance

Summary" document, in which she again recommended that WellStar terminate

Godwin.  In the document, Brown stated that Godwin "had a defensive posture

when [others were] attempting to counsel [her] on performance."  This was

inconsistent with Brown's earlier observation in her mid-year evaluation that

Godwin had "a willingness to correct poor performance."

While Tifft was out, Trupiano had weekly meetings with Brown to discuss

the operations of the purchasing department and the performance of the employees

---

[10]Tifft does not recall making that statement.

in that department, including Godwin.  Brown recommended that WellStar terminate Godwin's employment.  At this time, Trupiano was aware of the comments Brown made about Godwin's age, Godwin's complaint against Brown, and the investigation made into the complaint.  However, Trupiano was not working directly with Godwin.

Trupiano was aware that Godwin had received multiple PIPs and knew that Godwin's former supervisor believed Godwin's performance failed to meet expectations.  Trupiano also claims to have received complaints about Godwin's performance.  When Trupiano and Brown discussed terminating Godwin's employment, Trupiano reviewed a number of Godwin's purchase orders to confirm that the problems were ongoing within the past couple of weeks and occurring at an unacceptable frequency.

However, Trupiano testified that all of the information he reviewed regarding Godwin's termination (including the purchase orders) came from Brown and that he did not conduct an independent investigation to verify that the information was complete or accurate.[11]  When asked whether he would have terminated Godwin's employment in the absence of Brown's recommendation, Trupiano testified, "Would I have terminated her on my own?  She was not a direct

---

[11]The relevant portion of Trupiano's deposition transcript reads, in full:

Q    So you did not actually conduct an independent investigation to verify the completeness or accuracy of the information that Ms. Brown was giving you concerning Mary Godwin, did you?

A    I did not.

16

report, and I would not have."[12]  Brown, who admitted that buyers regularly made errors in purchase orders, did not know whether Godwin made more errors than other buyers.  Likewise, Brown did not provide Trupiano with information regarding purchase order errors for any other buyer, and Trupiano did not know how Godwin's rate of errors compared to other buyers.

The record does not contain copies of Godwin's purchase orders that Brown selected and gave to Trupiano or even how many orders were shown.  In the light most favorable to Godwin, there was no independent investigation by Trupiano regarding Godwin's error rate or how it compared to other employees who were buyers.

Eventually, Trupiano informed Betts that he and Brown wanted to move forward with terminating Godwin's employment due to her ongoing performance problems.  Betts did not object to the decision.

Brown called Tifft, who was still out on medical leave, and told him that WellStar was moving forward with the termination of Godwin's employment.

---

[12]The relevant portion of Trupiano's deposition transcript reads, in full:

Q    If Cherise Brown hadn't come to you and recommended Ms. Godwin's termination, would you have terminated her?
A    If you're asking if I support the termination, I would have, yes.
Q    That's not what I'm saying.
A    Okay. What are you asking?
Q    I'm asking you a "but for" question.  If Cherise Brown had not come to you and recommended Ms. Godwin's termination, would you have approved her termination or would you have terminated her on your own?
A    Would I have approved?  Yes.  Would I have terminated her on my own? She was not a direct report, and I would not have.

17

Tifft said he "wasn't in much shape to say anything" and did not do any independent investigation to determine if Godwin's performance at the time of her termination was subpar.

On June 22, 2011, Brown informed Godwin that her employment was terminated. WellStar replaced Godwin by hiring Bart Weddington, a male in his twenties.

## II. PROCEDURAL BACKGROUND

On October 26, 2012, Godwin filed a four-count complaint against WellStar, alleging age discrimination in violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. §§ 621–634 ("Count I"); retaliation in violation of the ADEA ("Count II"); discrimination based on a failure to accommodate in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101–12213 ("Count III"); and retaliation in violation of the ADA ("Count IV"). Godwin sought, inter alia, back pay and benefits, reinstatement or front pay, liquidated damages under the ADEA, and compensatory and punitive damages under the ADA.

After WellStar answered, Godwin deposed seven WellStar employees, including Brown and Trupiano.

On July 29, 2013, WellStar filed a motion for summary judgment. In its motion, WellStar conceded that Godwin established a prima facie case on her age

18

discrimination claim but argued that its evidence established "a legitimate non-discriminatory reason for the adverse employment action."  WellStar also argued that Godwin failed to provide sufficient evidence to show that its non-discriminatory reason was pretext for age discrimination.

On August 22, 2013, Godwin filed a response in opposition to WellStar's motion for summary judgment.  Godwin attached to her response an exhibit from her co-worker, Lynn Bryant.  Bryant reviewed purchase orders by Godwin and four other buyers, and she concluded that all five had similar error rates.  Three of the other four remained as employees at WellStar through August 22, 2013.

In a March 27, 2014 order, the district court granted WellStar's motion for summary judgment on all counts of Godwin's complaint.  Godwin timely appealed.

### III. STANDARD OF REVIEW

We review <u>de novo</u> a district court's decision to grant or deny summary judgment.  <u>Moton v. Cowart</u>, 631 F.3d 1337, 1341 (11th Cir. 2011).  We review the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  <u>Crawford v. Carroll</u>, 529 F.3d 961, 964 (11th Cir. 2008).  "Summary judgment is appropriate only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  <u>Moton</u>, 631 F.3d at 1341 (quoting Fed. R. Civ. P.

19

56(a)).  "The moving party may meet its burden to show that there are no genuine issues of material fact by demonstrating that there is a lack of evidence to support the essential elements that the non-moving party must prove at trial."  Id.

To survive a motion for summary judgment, the non-moving party must offer more than a "mere scintilla of evidence."  Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1162 (11th Cir. 2006) (quotation marks omitted).  Rather, "there must be enough of a showing that the jury could reasonably find for that party."  Id. (quotation marks omitted).

## IV. THE ADEA

On appeal, Godwin points to substantial evidence of Brown's age-based animus.  Under the cat's paw doctrine, Godwin contends that her evidence created genuine issues of material fact (1) as to whether Trupiano merely rubberstamped Brown's termination recommendation or conducted an independent investigation before terminating Godwin, and (2) as to whether Brown's recommendation was the but-for cause (that is, the determinative cause or determinative influence) in Trupiano's firing of Godwin.  See Sims v. MVM, Inc., 704 F.3d 1327, 1335–36 (11th Cir. 2013).

### A.    General Principles

"The ADEA prohibits employers from discharging an employee who is at least 40 years of age because of that employee's age."  Id. at 1331 (citing 29

20

U.S.C. §§ 623(a)(1), 631(a)).  The language "because of" in the ADEA statute means that the plaintiff must prove that the age discrimination was the "but for" cause of the adverse employment action.  Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176, 129 S. Ct. 2343, 2350 (2009); Sims, 704 F.3d at 1332.

A plaintiff may show age discrimination through direct or circumstantial evidence.  Sims, 704 F.3d at 1332 (citing Mora v. Jackson Mem'l Found., Inc., 597 F.3d 1201, 1204 (11th Cir. 2010)).

Where a plaintiff brings claims under the ADEA, "we analyze the allocation of burdens and the presentation of proof under the framework articulated" in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 797, 93 S. Ct. 1817, 1821 (1973).  Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012). "Following Gross, we have continued to evaluate ADEA claims based on circumstantial evidence under the McDonnell Douglas framework."  Sims, 704 F.3d at 1332; see also id. at 1333 (summarizing other circuits' continuing application of McDonnell Douglas after Gross).

Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination, "which 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'"  Kragor, 702 F.3d at 1308 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct.

21

1089, 1094 (1981)); see Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).

To make out a prima facie case of age discrimination under the ADEA, a plaintiff must show (1) "that she was a member of the protected group of persons between the ages of forty and seventy"; (2) "that she was subject to adverse employment action"; (3) "that a substantially younger person filled the position that she sought or from which she was discharged"; and (4) "that she was qualified to do the job for which she was rejected." Kragor, 702 F.3d at 1308 (quotation marks omitted).

Once a plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer to rebut the presumption with evidence of a legitimate, non-discriminatory reason for the adverse employment action. See id.; Chapman, 229 F.3d at 1024. Because the burden is one of production, not persuasion, the defendant meets its burden by presenting evidence that "raises a genuine issue of fact as to whether" the legitimate, non-discriminatory reason was the true reason for the adverse employment action. Kragor, 702 F.3d at 1308.

If the employer produces a legitimate, non-discriminatory reason for the adverse action, the plaintiff "must introduce significantly probative evidence showing that the asserted reason is merely a pretext" in order to survive a motion for summary judgment. Brooks, 446 F.3d at 1163. To establish pretext, a plaintiff

22

must show both that the reason given by the employer was false and that discrimination was the real reason.  See id.  The plaintiff can establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Burdine, 450 U.S. at 256, 101 S. Ct. at 1095.  Ultimately, however, a plaintiff must show that the discriminatory reason was the but-for cause of the adverse employment action.  See Gross, 557 U.S. at 177, 129 S. Ct. at 2351; Sims, 704 F.3d at 1335.

Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee.  Sims, 704 F.3d at 1333.  Although post-Gross, we still use the McDonnell Douglas framework in ADEA cases, "this framework is not the sine qua non for a plaintiff to survive summary judgment in a discrimination case."  Id.; Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  Instead, the plaintiff must still present evidence that creates a triable issue concerning the employer's discriminatory intent.  Sims, 704 F.3d at 1333; Smith, 644 F.3d at 1328.

## B.    The "Cat's Paw" Doctrine

Before evaluating the evidence, we review the "cat's paw" doctrine because Godwin must prove that Brown's age-based animus was the but-for cause of, or the determinative influence on, Trupiano's termination decision.  See Sims, 704

23

F.3d at 1335–36 (describing the but-for cause as the determinative cause or determinative influence).

Under certain circumstances, a plaintiff can establish but-for causation even where the person who ultimately decided to take the adverse employment action was neutral and unbiased.  See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) (citing Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998)).  Under the cat's paw doctrine, a plaintiff may establish but-for causation if she shows that the unbiased decision-maker (here Trupiano) followed a "biased recommendation without independently investigating the complaint against the employee."  Id.  "In such a case, the recommender is using the decisionmaker as a mere conduit, or cat's paw[,] to give effect to the recommender's discriminatory animus."  Id. (quotation marks omitted).  In the past, this Court has analyzed whether the ultimate decision was merely a "rubber stamp" of the recommendation when considering whether the decision-maker acted as a "cat's paw."  See id.

More recently, the Supreme Court addressed the cat's paw doctrine in a case brought under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4311.  Staub v. Proctor Hosp., 562 U.S. 411, 131 S. Ct. 1186 (2011).  USERRA provides that members of uniformed services "shall not be denied initial employment . . . or any benefit of employment by an

24

employer on the basis of" their membership in a uniformed service.  38

U.S.C. § 4311(a).  However, USERRA further provides that an employer acts

unlawfully under § 4311(a) when a person's membership in a uniformed service

"is a motivating factor in the employer's action."  Id. § 4311(c)(1) (emphasis

added).[13]

In Staub, the Supreme Court held that, "if a supervisor performs an act

motivated by [prohibited] animus that is intended by the supervisor to cause an

adverse employment action, and if that act is a proximate cause of the ultimate

employment action, then the employer is liable under USERRA."  Id. at ___, 131

S. Ct. at 1194 (footnote omitted).

## C.    Applying the Cat's Paw Doctrine in post-Staub ADEA Cases

This Court has already reviewed Staub and held that its "motivating factor"

standard does not apply to cat's paw cases involving age discrimination.  Sims, 704

F.3d at 1336.  In Sims, this Court noted that "the text of the USERRA and the

ADEA differ in important respects."  Id. at 1335.  Specifically, this Court noted

that "the ADEA states that it is unlawful if an employee suffers adverse

employment action 'because of such individual's age,'" id. (quoting 29 U.S.C. §

---

[13]USERRA covers any "person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service."  See 38 U.S.C. § 4311(a).

As in Sims, we need not decide and do not decide here whether Staub changes in any way our prior cat's paw ADEA cases with respect to agency principles as they relate to scienter.  See Sims, 704 F.3d at 1336.

25

623(a)(1)), whereas USERRA's causation standard requires only that the unlawful animus was a "motivating factor," id. (quoting 38 U.S.C. § 4311(c)).[14] Accordingly, the Sims Court stated, a plaintiff alleging violations of the ADEA "must prove that age was the 'but-for' cause of the employer's adverse decision," which "requires that the proscribed animus have a determinative influence on the employer's adverse decision." Id. at 1335–36 (quotation marks omitted) (emphasis added).[15] In addition, this Court has interpreted the ADEA's causation standard as requiring more than a mere causal link between an action motivated by unlawful animus and the adverse employment action.

Thus, in order to succeed under a cat's paw theory of liability, an ADEA plaintiff must show more than that her adverse employment action would not have occurred in the absence of the action taken by the individual (Brown) with the alleged unlawful animus. Rather, the plaintiff must show that the biased individual's action had a "determinative influence" on the ultimate decision, see Sims, 704 F.3d at 1335–36, or was a "determinative cause," see Simmons, 647

---

[14]In Sims, this Court pointed out that the Tenth Circuit in Simmons v. Sykes Enterprises, Inc., 647 F.3d 943 (10th Cir. 2011), held that Staub's causation analysis did not govern claims brought under the ADEA. See Sims, 704 F.3d at 1336 (citing Simmons, 647 F.3d at 949–50). The Tenth Circuit stated that, "even after Staub, an ADEA plaintiff seeking to hold an employer liable through the discriminatory conduct of its subordinate must show the subordinate's animus was a 'but-for' cause of the adverse employment action, i.e. it was the factor that made a difference." Simmons, 647 F.3d at 949–50.

[15]As in Sims, we need not decide anything more about Staub's potential effect, if any, on other issues in ADEA cases. See Sims, 704 F.3d at 1336.

F.3d at 950. And the but-for cause that a biased individual recommended that the plaintiff's employment be terminated does not constitute a "determinative cause" where "undisputed evidence in the record supports the employer's assertion that it fired the employee for its own unbiased reasons that were sufficient in themselves to justify termination." See id. at 950.

## V. GODWIN'S AGE DISCRIMINATION CLAIM UNDER THE ADEA

In this case, the record creates genuine issues of material fact as to whether WellStar discriminated against Godwin, in violation of the ADEA, under the cat's paw doctrine. If a jury believes plaintiff Godwin's evidence, a reasonable jury could find that Trupiano did not conduct an independent investigation and that Brown's recommendation was the "but-for" cause of, or the determinative influence on, Trupiano's decision.

The record contains ample evidence to create genuine issues of material fact as to whether Brown recommended termination of Godwin because of discriminatory age-based animus. Brown admits that she asked Godwin her age. And Godwin alleges that Brown made several ageist comments, including (1) asking Godwin why, at her age, was she still working; (2) stating that, at Godwin's age, she should be home with her husband; (3) saying that Godwin should have planned for certain expenses when she was young; (4) stating that Godwin was not "capable of mentally understanding" her job; (5) saying that Godwin should

27

probably be home with her husband because he was ill; and (6) stating that Brown was "going to put [Godwin] out to pasture."

Furthermore, Tifft's testimony indicates that Brown admitted that she said Godwin should have made provisions for being out of work when she was young, and that Brown knew she "messed up" by making that comment. And although Brown claims to have been trying to give Godwin "options" by asking why Godwin was working "past retirement age" and stating that, in light of Godwin's age, she thought Godwin would want to be home taking care of her husband, Tifft agreed that a reasonable interpretation of Brown's comments is that she was trying to suggest "retirement options."

Godwin also presented evidence that at least one other employee—Carpenter, who was interviewed as part of the investigation into Godwin's complaint to human resources—thought that Brown was "trying to get rid of her because of her age." And a separate employee allegedly said that Brown was trying to sabotage Godwin.

Based on this record evidence, there are at least genuine issues of material fact as to whether Brown was motivated by age and as to whether she intended the precise adverse employment action taken here—namely, termination.

Similarly, the record contains sufficient evidence to create a genuine issue of material fact as to whether Brown's recommendation had the determinative

28

influence on Trupiano's recommendation. Drawing all reasonable inferences in favor of Godwin, a jury could conclude that Trupiano would not have fired Godwin but for Brown's recommendation. When asked whether he would have terminated Godwin's employment in the absence of Brown's recommendation, Trupiano testified, "Would I have terminated her on my own? She was not a direct report, and I would not have." This testimony, viewed in the light most favorable to Godwin, taken with the other extensive evidence in this case, establishes a causal link between Brown's recommendation and Trupiano's ultimate decision.

In addition, there is sufficient evidence to create an issue of material fact as to whether Brown's recommendation so permeated Trupiano's review of Godwin that Trupiano failed to conduct a truly independent investigation. Although Trupiano reviewed a number of Godwin's purchase orders before making the decision to fire her, the evidence, viewed in the light most favorable to Godwin, suggests that Brown herself chose from Godwin's file the purchase orders that Trupiano reviewed. Trupiano testified that he did not conduct an independent investigation to verify the completeness or accuracy of the information that Brown gave him. As a result, Trupiano did not know the percentage or ratio of Godwin's purchase orders that had errors. Furthermore, Trupiano did not review purchase orders by other buyers in the purchasing department. Trupiano admitted that he had "no direct knowledge" of the quantity of mistakes made by other purchasing

29

department buyers.  And he did not know how Godwin's error rate compared to the error rates of other buyers.[16]

In addition, Bryant, Godwin's co-worker, reviewed purchase orders by Godwin and four other buyers, and she concluded that all five had similar error rates.  Although Godwin was fired, three of the other four remained as employees at WellStar through August 22, 2013, and the fourth worked at WellStar until June 2013.

Put simply, viewing the evidence in the light most favorable to Godwin and drawing all reasonable inferences in Godwin's favor, the record evidence creates genuine issues of material fact as to whether Brown's recommendation was the result of age-based animus and whether that recommendation had the determinative influence on Trupiano's ultimate decision to fire Godwin.

## VI. CONCLUSION

For all the foregoing reasons, we reverse the district court's order granting WellStar's motion for summary judgment on Godwin's age discrimination claim but affirm as to all other claims made by Godwin.

**AFFIRMED IN PART AND REVERSED IN PART.**

---

[16]Indeed, although Brown made the recommendation to fire Godwin, even she did not know whether Godwin made more errors than other buyers.

30