MARY S. SCRIVEN, UNITED STATES DISTRICT JUDGE
THIS CAUSE comes before the Court for consideration of the Motion for Summary Judgment filed by Defendant, Seminole Electric Cooperative, Inc., (Dkt. 25), the Response in opposition thereto filed by Plaintiff, Jozette Thomas, (Dkt. 35), Defendant's Objections to Plaintiff's Response, (Dkt. 47), and Defendant's Reply to Plaintiff's Response, (Dkt. 48). Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court GRANTS Defendant's Motion for Summary Judgment.
I. BACKGROUND[1]
Plaintiff asserts that the Defendant discharged her from employment in May 2016 because of her gender and age, in violation of Title VII, the Age Discrimination in Employment Act of 1967 ("ADEA"), and the Florida Civil Rights Act ("FCRA"). (Dkt. 34 ¶ 1). Plaintiff also alleges that she was subjected to unlawful sexual harassment and age harassment in violation of Title VII, the ADEA, and the FCRA.[2]
Defendant is a non-profit, member-owned Generation and Transmission rural electric cooperative. (Dkt. 34 ¶ 1). Plaintiff began her employment with Defendant in *1251 February 1997 as a programmer, initially, and became a systems programmer supporting the mainframe computer in 1999. (Dkt. 25 ¶ 2). Plaintiff's job duties encompassed work with hardware and software on a mainframe-based computer system prior to Defendant's transition to a server-based environment. The Parties dispute Plaintiff's job duties after the mainframe was decommissioned. (Dkt. 8 ¶ 15).
Julian Leon ("Leon") was originally Defendant's Manager of Technical Support who served as Plaintiff's direct supervisor. (Dkt. 43 at 6). After Leon's retirement in July 2011, through the time of Plaintiff's discharge, Rick Miller ("Miller") served as Plaintiff's immediate supervisor, reporting to Steve Saunders ("Saunders"), the Director of Information Technology. (Dkt. 34 ¶ 2). In addition to Plaintiff, Miller also supervised the other employees who made up the Technical Support area, which included John Phillips, Will Simmons, Rishi Maharaj, and Michael Estevens. (Dkt. 25 ¶ 4).
From 2012 through March 2014, Defendant began the process of transitioning from its mainframe computing environment to a PC and server-based computing environment. (Dkt. 34 ¶ 3). During this time, Defendant transitioned all of its applications and functions from the mainframe to PCs and servers, culminating in the ultimate shutdown and decommissioning of Defendant's mainframe on March 13, 2014. Id.
When Defendant began the transition to a PC server-based computing environment, Plaintiff had no experience working in that environment. Rather, her expertise "was on the mainframe side, not the server side," and she "didn't have any real experience with the server system." (Dkt. 34 ¶ 4). Plaintiff's educational background and training also focused exclusively on mainframe responsibilities. Id. Other employees in the department had experience with server-based computing. (Dkts. 25 ¶ 8; 35 ¶ 9). Plaintiff testified that she was not aware of anyone else working for the Defendant whose experience was mainframe-based and who would need to acquire a new skill after the transition. (Dkt. 27 at 81). Plaintiff testified that no one specifically mentioned that her job would be eliminated, but that she was concerned that her position may be eliminated or that she would be laid off after the mainframe transition because what she had been doing "was no longer going to be continuing in that format[.]" (Dkt. 27 at 79-80). Plaintiff testified that she began to look for other jobs at the time, both internally and externally. Id. at 80-81.
Defendant contends that Plaintiff was assigned a number of non-mainframe responsibilities to assist Plaintiff in gaining a working knowledge and expertise in a PC server-based environment. (Dkt. 25 ¶ 12). Specifically, Miller assigned Plaintiff to assist John Phillips with Defendant's IT hotline, which employees could call to get help on various computing issues, and to shadow John Valles on weekly trips to assist employees at the Defendant's power plant with computer issues. Id. ¶¶ 12-13. Miller also approved Plaintiff's request for a week-long course on PC servers in 2012 and directed Plaintiff to take a week-long Microsoft training course on a specified product in 2013. Id. Additionally, Plaintiff attended two trainings in 2013, on Microsoft and Windows products. Id. ¶ 14. Plaintiff also sought courses to take outside of work in an effort to further improve her server skills and requested that Defendant purchase a training book for her, which Defendant did. Id.
Defendant required each employee complete at least twenty hours of mandatory job-related training during Plaintiff's employment. (Dkts. 38 at 61; 42 at 15). Defendant *1252 asserts that despite its efforts and patience, Plaintiff was unable to make a successful transition from the mainframe environment to the PC-server based environment. (Dkt. 25 ¶ 16). Defendant offers an internal list of department responsibilities to illustrate that Plaintiff was unable to assume the responsibility levels nearly equal to those of her co-workers. Id.
Plaintiff disputes the efficacy of these so-called trainings and Defendant's characterization of trainings as unsuccessful. (Dkt. 35 ¶¶ 15-16). Additionally, Plaintiff challenges the accuracy of Defendant's chart as an attempt by Defendant to minimize Plaintiff's responsibilities. Id. Plaintiff further contends that she was denied proper training and instruction to complete assigned tasks. (Dkt. 1 ¶ 39). Specifically, Plaintiff argues that she was excluded from attending weekly management meetings by a co-worker in 2012, excluded from a vendor presentation for tech services, and was assigned clerical tasks. Id. ¶¶ 30-31, 45.
Plaintiff's Annual Performance Evaluations during the relevant time period range from a 4, exceeds expectations, to a 2, meets expectations. (Dkt. 27-1). In 2011, Plaintiff received a 4, exceeds expectations, and commented on her evaluation that she felt the review did not adequately represent her efforts through the past year. Id. at 46. Plaintiff's 2012 evaluation reflects a 2.16, meets expectations; her 2013 review shows a 2.37, meets expectations. Id. at 48-61. In 2014, Plaintiff initially received an overall rating of 1.57, does not meet expectations, which Miller rounded up to a 2.0, meets expectations. Id. at 71. Miller's comments on Plaintiff's 2014 review note that Plaintiff attended class to prepare for and complete the installation of Microsoft System Center Service Desk Change Control software, but was ultimately unable to install the product, despite spending nearly six months on the project. Id. Plaintiff contests whether the substance of the training was sufficient to instruct her to complete the project but admits that she attended the training and spent a significant amount of time on the project. (Dkt. 35 ¶ 17). Plaintiff comments in her 2014 review that she was using her own resources to buy her own books and research classes in an effort to make a successful transition from the mainframe environment to a server-based environment. Id. After Plaintiff's 2014 review, Miller provided Plaintiff with a Performance Improvement Task Plan to help improve her performance and a report detailing her progress on these tasks. Id. at 71-75. The progress report notes that Plaintiff did "well" on two tasks, was "running out of time" on one task and that Miller "would like to see more effort in troubleshooting by logging on each night to watch the jobs run" on a third project. Id. at 75. In 2015, Plaintiff received an overall performance evaluation of 3.2, meets expectations. (Dkt. 1 Ex. E). Miller commented on the 2015 review that Plaintiff accomplished most of her goals with efficiency and that Plaintiff's initial support of the JAMS technology system was not meeting expectations and had to be reassigned, but that Plaintiff was performing better after the reassignment. Id.
Miller issued a Performance Improvement Plan ("PIP") to Plaintiff on Mach 7, 2016 as a "last ditch effort" for Plaintiff. (Dkt. 36 at 75). Plaintiff, Miller, and Kelly Faircloth ("Faircloth"), a human resources representative of Defendant, met to discuss the PIP. (Dkt. 35 ¶ 20). This was Plaintiff's first meeting with Faircloth. Id. The PIP identified areas of concern, improvement goals, recourse, expectations, and progress checkpoints. (Dkt. 27-1 at 87-89). Moreover, the PIP established that the failure to meet or exceed identified expectations would result in further disciplinary *1253 action, up to and including termination. The PIP explicitly stated that if there was no demonstrated, significant improvement indicating that the expectations and goals will be met, employment could be terminated prior to completion of the 90-day period. Id.
The PIP assigned five performance standards, including two specific projects, which Plaintiff was required to accomplish in order to demonstrate progress towards the achievement of Plaintiff's identified goals. Id. First, Plaintiff needed to take over the Printer project from John Phillips and upgrade printer services with minimal assistance from other team members. Id. Second, Plaintiff needed to get the Help site for SharePoint forms operational with updated information for each form. Id. at 88. Defendant asserts that it became evident, shortly after the PIP was issued to Plaintiff, that Plaintiff was relying too heavily on a co-worker to complete her responsibilities and was failing to make any appreciable progress on her PIP tasks. (Dkt. 25 ¶ 21-22). Plaintiff disputes this claim and presents conflicting evidence that Miller instructed Plaintiff to seek assistance from employees and that she did make appreciable progress with the Printer project. (Dkt. 35 ¶¶ 21-22). Plaintiff does not dispute that the project was not yet complete at the time of her discharge. Id. ¶ 22. Defendant discharged Plaintiff on May 10, 2016, 64 days into the 90-day PIP review period. Id. William Barfied, a male younger than 40, was hired by Defendant after Plaintiff's discharge. Id. ¶ 23.
During Plaintiff's employment, Defendant maintained a policy prohibiting sexual and age-related harassment and providing a reporting procedure for any employee who feels that he or she has been subjected to unwanted harassment. (Dkt. 34 ¶ 5). The policy specifically prohibits sexual and age-related harassment, including such inappropriate conduct as off-color jokes, sexual comments, offensive age-based comments, and the like. Id. The policy also states that any employee who feels that he or she has been subjected to unlawful harassment "should report the incident immediately to his or her immediate supervisor and to Human Resources, or any other member of management." Id. The policy continues that if the immediate supervisor is involved in the activity, the violation should be promptly reported to Human Resources, or any other member of management. Id. Defendant asserts that a training was held for all employees in 2014 and 2015, as part of a mandatory Business Ethics course which addressed the Company's policy prohibiting unlawful harassment and complaint-reporting procedures. (Dkt. 25 ¶ 25). Plaintiff admits that Defendant maintained and disclosed its anti-harassment policy as described but contends that Defendant mischaracterizes the Business Ethics course as a comprehensive training for the anti-harassment policy. (Dkt. 35 ¶ 25).
Plaintiff claims that after Miller became her supervisor in July 2011, he treated her differently, talked down to her, and used foul language directed specifically at Plaintiff when he was upset. (Dkt. 25 ¶ 26). Plaintiff alleges that Miller made inappropriate age-related comments, such as "you're old enough to remember that," which demonstrated that Miller was "trying to push [her] out the door." Id.; Dkt. 35 ¶ 32. Specifically, Plaintiff testified that shortly after Leon left and Miller became her manager, during a discussion about the future of the department between her and Miller, Miller said that he "dreaded teaching somebody like me, my age, with no experience in the servers." (Dkt. 27 at 77-78). Plaintiff testified that Miller asked her several questions about retirement including: when she planned to retire, how *1254 her 401(k) was allocated, and what her plans after working for Defendant entailed. (Dkt. 25 ¶ 32). Additionally, Plaintiff claims that Miller specifically lashed out at her and that he would curse and yell at her for trivial matters. (Dkt. 35-2 ¶ 21). Specifically, Plaintiff asserts that Miller would say "Shit, why the hell doesn't this work?" or "what the 'F' are you doing?" to her and that he did not curse at other employees the same way. Id.
Plaintiff testified that Miller would direct sexually-laced comments towards Plaintiff when they were alone and this behavior was "ongoing," and she testified, contradictorily, that it occurred "once a week. It might be a couple of times over two, three weeks." (Dkt. 35 ¶¶ 28-30). Plaintiff testified that once, in response to Plaintiff's concern that she was having difficulty enlisting the assistance of other managers in updating the servers, Miller used the words "pussy" and "tits," to say that she had "the right equipment" to secure assistance. (Dkts. 25 ¶ 28; 27 at 159-86). Plaintiff also testified that Miller would make crude comments in her presence about "getting his wife drunk and having his way with her" and that he was "heading to the bathroom to take care of himself." (Dkt. 21 ¶ 30; Dkts. 27-29).
In January 2012, Plaintiff reported an offensive joke with foul language and questionable humor, made by Miller, to Saunders. (Dkt. 25 ¶ 29). According to Plaintiff, Miller asked "what do baby bears and women from Tennessee have in common," to which he replied, "they both suck their paws." Id. Saunders testified that after the report from Plaintiff he met with Miller to discuss the comment, asked Miller to apologize, and that Miller apologized to Plaintiff for the comment. Id. Saunders further testified that he wrote himself a handwritten note detailing the incident and his response, but he conceded that no formal action was taken against Miller, nor was Human Resources informed of the incident. (Dkts. 37 at 50-51, 37-2). Plaintiff testified that the inappropriate language from Miller stopped immediately following her conversation with Saunders, but inappropriate comments by Miller resumed sometime later. (Dkt. 25 ¶¶ 29-30).
Plaintiff testified that she reported Miller's use of profanity and foul language to Julian Leon while Leon was still the supervisor and she and Miller were co workers. (Dkt. 35 ¶ 28). Leon testified that Plaintiff approached him about Miller's use of profanity in her presence and that he spoke with Miller and requested he refrain from the use of profanity. Id. Plaintiff testified that she did not report the discriminatory behavior by Miller beyond these initial conversations with Leon and Saunders because "nothing changed" when she previously reported Miller's conduct to Leon and Saunders. Id. ¶¶ 29-32. Plaintiff also testified that she did not report this behavior because she had concerns about being terminated due to Defendant's discriminatory culture. Id. Specifically, Plaintiff testified that during a staff meeting in April 2012, Saunders made an inappropriate comment about choosing his seat at a baseball game based on the best view of women in the stadium. (Dkt. 25 ¶ 31).
On May 19, 2016, Plaintiff filed a Dual Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations, charging Defendant with discrimination based on sex and age. The EEOC Tampa Director issued Plaintiff a Notice of Rights dated September 19, 2016, and Plaintiff filed this lawsuit on December 14, 2016. Plaintiff alleges six counts: Count I, Gender discrimination in violation of Title VII (Disparate Treatment); Count II, Gender discrimination in violation of Title VII
*1255 (Harassment - Hostile Work Environment); Count III, Age discrimination in violation of the ADEA (Disparate Treatment); Count IV, Age discrimination in violation of the ADEA (Harassment - Hostile Work Environment); Count V, Gender discrimination in violation of the FCRA; and Count VI, Age discrimination in violation of FCRA. (Dkt. 1). Defendant has moved for summary judgment as to all counts. (Dkt. 25).
II. STANDARD OF REVIEW
Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007) ). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).
Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356 ). A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).
When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1320-21 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value."). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ... the court may grant summary judgment if the motion and supporting materials ... show that the movant is entitled to it." Fed. R. Civ. P. 56(e).
III. DISCUSSION
Defendant argues that summary judgment is proper with respect to Plaintiff's gender and age discriminatory discharge claims because Plaintiff was not qualified to meet job performance expectations after Defendant transitioned from a mainframe computing environment to an environment based on PCs and servers. (Dkt. 25 at 1-2). Secondly, Defendant contends summary judgment is appropriate as to Plaintiff's allegations of unlawful harassment based on her gender and age because, even if Plaintiff's allegations are true, Plaintiff was not subjected to sufficiently severe or pervasive conduct and Defendant took sufficient, prompt remedial action in response to Plaintiff's report of Miller's conduct. Each claim is addressed in turn.
A. Disparate Treatment Discriminatory Discharge Claims
Plaintiff alleges that Defendant discriminated against her by terminating her because she was a woman over the age of 40 and replacing her with a younger male employee. (Dkt. 1 ¶ 80). Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, *1256 or privileges of employment" because of sex. 42 U.S.C. § 2000e-2(a)(1).[3] Rollins v. Cone Distributing, Inc., 710 Fed. App'x. 814, 821 (11th Cir. 2017)[4] (citing Hinson v. Clinch Cty. Ga. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000) ). Moreover, the ADEA, 29 U.S.C. § 621 et seq. , prohibits employers from discharging an employee who is at least 40 years of age "because of" the employee's age. 29 U.S.C. §§ 623(a)(1), 631(a). A plaintiff must prove her age was the "but-for" cause of the adverse employment action in order to establish a disparate treatment claim under the ADEA. See Gross v. FBL Fin. Services, Inc., 557 U.S. 167, 176-77, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). A plaintiff bears the burden of proving that the employer unlawfully discriminated against her and may establish an age or gender discrimination claim through direct or circumstantial evidence. See Rollins, 710 Fed. App'x. at 821 ; Mora v. Jackson Mem'l Found., Inc., 597 F.3d 1201, 1204 (11th Cir. 2010) ; Gross, 557 U.S. at 177-78, 129 S.Ct. 2343.
Plaintiff employs circumstantial evidence to support her discrimination claim. Age or gender discriminatory discharge claims premised solely on circumstantial evidence are subject to the McDonnell Douglas framework. Sims v. MVM, Inc., 704 F.3d 1327, 1332 (11th Cir. 2013) (holding that McDonnell Douglas framework continued to apply in age discrimination cases even after Gross ); Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004) ("In evaluating [Title VII] disparate treatment claims supported by circumstantial evidence, we use the framework established by the Supreme Court in [ McDonnell Douglas.]"). "Under this framework, a plaintiff must first establish a prima facie case of discrimination. Next, the defendant must articulate a legitimate, non-discriminatory reason for the challenged employment action. If the defendant articulates one or more such reasons, the plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination." Sims, 704 F.3d at 1332 (citations omitted). "Pretext means more than an inconsistency or a mistake, pretext is 'a lie, specifically a phony reason for some action.' " Austin v. Progressive RSC, Inc., 510 F. Supp. 2d 855, 866 (M.D. Fla. 2007) (quoting Silvera v. Orange Cty. School Bd., 244 F.3d 1253, 1261 (11th Cir. 2001) ).
Plaintiff establishes a prima facie case of Title VII discrimination by showing that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." Burke-Fowler v. Orange Cnty., Fla. 447 F.3d 1319, 1323 (11th Cir. 2006). Similarly, "[i]n order to make out a prima facie case for an ADEA violation, the plaintiff must show that [s]he (1) was a member of the protected age group, (2) was subject to [an] adverse employment action, (3) was qualified to do the job, and (4) was replaced by a younger individual." Dexter v. Amedisys Home Health, Inc. of Alabama, 965 F. Supp. 2d 1280, 1293 (N.D. Ala. 2013) (alterations in *1257 original) (quoting Williams v. Vitro Services Corp., 144 F.3d 1438, 1441 (11th Cir. 1998) ).
The Parties do not dispute that Plaintiff is a member of a protected class, was subject to an adverse employment action and was replaced by a younger individual. Defendant argues that Plaintiff's prima facie discriminatory discharge claims fail because Plaintiff cannot show that she was qualified for her position after Defendant's mainframe computer was decommissioned. (Dkt. 25 at 13). Plaintiff maintains that she was qualified for her job. (Dkt. 35 at 14-15).
Plaintiff argues that her nineteen-year tenure and the testimony of and performance reviews authored by her former supervisor, Leon, demonstrate that she was qualified for her position. Id. at 14. For support, Plaintiff cites Liebman v. Metropolitan Life Ins. Co., 808 F.3d 1294, 1299 (11th Cir. 2015). In Leibman, the Court found that a genuine question of fact existed as to whether Plaintiff was qualified for the relevant position because he was performing substantially similar duties in the same role for nine years and had a 27-year tenure with the company. See 808 F.3d at 1299 (citing Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999) ). However, here Plaintiff cannot rely on her tenure with Defendant because she admits that the qualifications for her position changed drastically after the mainframe was decommissioned in 2014, two years prior to her discharge. (Dkt. 35 ¶¶ 10-11). Moreover, Leon's testimony cannot support Plaintiff's objective qualification for the job. He was neither employed by Defendant nor responsible for performance evaluations or employment decisions during the time period relevant to this case.
Persons who were employed at the relevant time period and who were responsible for Plaintiff's functions testified unequivocally that Plaintiff could not perform the basic functions of the job. See discussion supra at pgs. 1251-53. Plaintiff's performance evaluations and PIP progress report indicate that Plaintiff was experiencing performance issues. Id. Further, Plaintiff implicitly concedes that she could not perform the job as needed because one of her assertions of discriminatory treatment was Defendant's alleged failure to provide her with the training opportunities she needed to be able to perform the essential functions of the job. Thus, Defendant has established that Plaintiff cannot meet her burden of establishing a prima facie case.
Even if Plaintiff could make out a prima facie case, Defendant has offered evidence that Plaintiff's discharge was for a legitimate, non-discriminatory reason: that she was unable to meet the Defendant's job performance expectations despite Defendant's efforts to provide her with the necessary skill set. Plaintiff insists that this reason is pretext for discrimination. A proffered reason is pretextual only "if it is false and the true reason is impermissible." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "A plaintiff cannot establish pretext by merely questioning the wisdom of the employer's reasoning, especially where 'the reason is one that might motivate a reasonable employer.' " Austin, 510 F. Supp. 2d at 866 (quoting Lee v. GTE Florida, Inc., 226 F.3d 1249, 1255 (11th Cir. 2000) ). At this stage, a "new level of specificity" applies, and the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."
*1258 Rioux v. City of Atlanta, 520 F.3d 1269, 1275 (11th Cir. 2008). The Court cannot not re-examine or substitute its judgment for the employer's business decisions. Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (courts should not be in the business of adjudging whether employment decisions are prudent or fair but shall merely determine whether unlawful discriminatory animus motivates a challenged employment decision).
"The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance. Thus, where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence." Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997). "We are not interested in whether the [employer's] conclusion is a correct one, but whether it is an honest one. Like all Title VII cases where pretext is an issue, the question the factfinder must answer is whether [the employer's] proffered reasons were 'a coverup for a ... discriminatory decision.' " Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ).
Defendant bolsters its non-discriminatory reason for discharge with evidence that it attempted to provide Plaintiff with the skillset to meet the expectations of her position in a post-mainframe environment. (Dkt. 25 at 16). Defendant also asserts that after Plaintiff's skills initially fell short of expectations, Defendant did not discharge her but provided her with a Performance Task Improvement Plan after her 2014 evaluation to aid her skillset development. Id. Defendant contends that although Plaintiff occasionally showed signs of potential, she eventually exhibited an inability to sustain potential progress. Id. Defendant states that it provided Plaintiff one final opportunity in March 2016 via the PIP and that the decision to discharge Plaintiff was only made after she failed to show improvement in the first few months of her probation. Id.
Plaintiff argues that Defendant's proffered reason is pretext for discrimination. To demonstrate the claim of pretext, Plaintiff identifies two potential male comparators who Plaintiff insists were treated more favorably than she despite their failings, which Plaintiff contends were at least as significant as hers. These individuals are John Phillips ("Phillips") and Rishi Maharaj ("Maharaj"). (Dkt. 35 at 18). Plaintiff asserts that her comparators were treated more favorably because they were never discouraged from collaborating with others and because only Plaintiff was placed on a PIP and terminated for performance reasons. Id. at 18-24. Specifically, Plaintiff contends that although both she and Phillips received an overall final performance evaluation rating of 3, meets expectations, for the 2014-2015 appraisal period, only Plaintiff was subsequently placed on a PIP and terminated. Id. Moreover, Plaintiff alleges that Phillips was given the opportunity to demonstrate improvement and was not subject to discipline despite a health problem that allegedly interfered with his ability complete his daily tasks. Id. Similarly, Plaintiff contends that Maharaj was not disciplined despite his flex work schedule, alleged attendance issues, and occasional failed jobs related to the JAMS servers. Id.
Defendant argues that Phillips is not a proper comparator because his performance-related conduct was attributable to a medical issue that was resolved once addressed by an accommodation required by *1259 the Americans with Disabilities Act. (Dkt. 48 at 10). Defendant argues that Maharaj is not an adequate comparator because he did not suffer from the same performance deficiencies and that Plaintiff's discharge was not related to attendance. (Dkts. 25 at 16, 48 at 10).
The Eleventh Circuit instructs that for comparators to be used to demonstrate pretext, they must be nearly identical, particularly with respect to job descriptions and material facts. Trask v. Secretary, Dept. of Veterans Affairs, 822 F.3d 1179, 1193 (11th Cir. 2016) (citing Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) ). Here, the evidence demonstrates that the proffered comparators performed job responsibilities dissimilar from Plaintiff's job duties and both comparators came from markedly different educational and technological backgrounds. For example, Plaintiff was at one point assigned to shadow Phillips to learn to assist with his helpdesk duties, in addition to her other responsibilities. Although Phillips and Plaintiff shared the same technical job title of senior systems administrator, Phillips's job responsibilities were never dependent on the mainframe environment and did not change after the transition to the server. (Dkt. 27 at 84). Plaintiff testified that everyone's title in the department changed to Senior Systems Administrator in 2013 because they were not considered programmers any longer. (Dkt. 27 at 124). Likewise, Maharaj's entire job description and educational and professional experience was on PCs and servers; thus, he was not required to learn how to operate in an entirely new computing environment. Plaintiff does not point to any evidence that Maharaj was disciplined or counseled based on his failures in regard to any such transition. Further, Plaintiff specifically testified that she was not aware of anyone else working for the Defendant whose experience was mainframe-based and who would need to acquire a new skill. (Dkt. 27 at 81). Thus, neither Maharaj nor Phillips is an adequate comparator.
Because Plaintiff does not proffer adequate comparators or objective evidence that she could perform Defendant's job expectations, Plaintiff has failed to show that Defendant's reason for her termination is pretext for discrimination. Accordingly, summary judgment is appropriate with respect to her disparate treatment discriminatory discharge claims.
B. Hostile Work Environment Claims
Plaintiff alleges that Defendant engaged in a pattern of harassment against Plaintiff because she was a woman over the age of 40 and that this pattern created a hostile work environment in violation of Title VII, the ADEA, and the FCRA. (Dkt. 1 ¶¶ 82-90, 97-107). To establish this claim, Plaintiff must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment complained of is based on the protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) ; Scelta v. Delicatessen Support Services, Inc., 89 F. Supp. 2d 1311, 1317 (M.D. Fla. 2000).[5] "The employee must 'subjectively *1260 perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999). "In evaluating the objective severity of the harassment, [courts] consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Miller, 277 F.3d at 1276.
Defendant argues that Miller's alleged conduct, even if accepted as true, was not sufficiently severe or pervasive to create a hostile work environment; rather, it amounted to sporadic offensive utterances that occurred infrequently, were not physically threatening, and did not interfere with Plaintiff's job. Defendant also asserts that courts have consistently found far more egregious facts warrant summary judgment in an employer's favor. In response, Plaintiff alleges that she was subject to daily hostility by Miller who, "made a point of revealing his discriminatory motivation on numerous occasions and thus confirmed that his pattern of overall misconduct was based on [Plaintiff]'s age and gender." (Dkt. 35 at 15-16).
To establish a hostile work environment claim, an "employee must present concrete evidence in the form of specific facts, not just conclusory allegations and assertions." Godoy v. Habersham County, 211 Fed. App'x. 850, 854 (11th Cir. 2006). Plaintiff does not claim that Miller's conduct was physically threatening but asserts that Miller's "profanity laced tirades directed at Plaintiff were solely due to her age and gender." (Dkt. 35 at 16). However, Plaintiff cites fewer than ten specific instances of conduct over a nearly five-year period. Such conduct is not sufficiently frequent to support a claim under prevailing law. Moreover, Miller's comments, though boorish and unacceptable, do not rise to the level of severity required to sustain a hostile work environment claim under prevailing standards. Plaintiff articulates a few specific remarks: the inappropriate Tennessee joke, at least one comment about Plaintiff's physical attributes, comments about his marital sex life, a perceived comment/innuendo about masturbation in the workplace restroom, and Miller's dread of training Plaintiff. Beyond those remarks, Plaintiff alleges the general use of profanity and discriminatory language by Miller. The Eleventh Circuit has recognized that profanity falls "under the rubric of general vulgarity that Title VII does not regulate." See Murphy v. City of Aventura, 383 Fed. App'x. 915, 918 (11th Cir. 2010). As Defendant notes, conduct significantly more severe than that at issue here has been deemed insufficient to establish a hostile work environment claim. See, e.g., Mendoza, 195 F.3d at 1247-49.
Finally, Defendant employs the so-called Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)- Ellerth [6] affirmative defense to *1261 argue that, even if Plaintiff can establish severe or pervasive harassment at the hands of Miller, Defendant is not liable because it took reasonable steps to prevent and remedy the conduct that was reported to it, and Plaintiff unreasonably failed to take advantage of those measures to avoid or minimize the alleged harassment. (Dkt. 25 at 18-19). The Court does not reach the merits of this defense because the Court does not find Miller's conduct sufficiently severe or pervasive to be actionable. Accordingly, summary judgment is proper as to Plaintiffs hostile work environment claims.
IV. CONCLUSION
Upon consideration of the foregoing, it is hereby ORDERED as follows:
1. Defendant's Motion for Summary Judgment, (Dkt. 25), is GRANTED.
2. The Clerk is directed to enter FINAL JUDGMENT in favor of Defendant.
3. After entry of final judgment, the Clerk shall terminate any pending motions and CLOSE this case.
DONE and ORDERED in Tampa, Florida, this 6th day of September, 2018.

As discussed further, infra Section II, the facts recited herein and all reasonable inferences therefrom have been viewed in a light most favorable to Plaintiff because this case is before the Court on Defendant's motion for summary judgment. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court notes that Plaintiff's Complaint (Dkt. 1) alleges seven Counts, but Plaintiff has abandoned Count VII that Defendant violated the Equal Pay Act provisions of the Fair Labor Standards Act 29 U.S.C. § 206(a)(1). (Dkt. 35 at 2).

The FCRA also makes it unlawful for employers to discriminate on the basis of sex. Fla. Stat. § 760.10(1)(a). Claims under the FCRA are analyzed under the same framework as claims brought under Title VII. See Jones v. United Space All., L.L.C., 494 F.3d 1306, 1310 (11th Cir. 2007).

The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority. See 11th Cir. R. 36-2." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

Plaintiff's FCRA and Title VII claims are analyzed together because: "[w]hen considering claims brought under the FCRA, Florida courts look to decisions interpreting Title VII...for guidance." Arnold v Heartland Dental, LLC, 101 F. Supp. 3d 1220, 1224 (M.D. Fla. March 30, 2015) (citing Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir.1998) ("The Florida courts have held that decisions construing Title VII are applicable when considering claims under the [FCRA], because the Florida act was patterned after Title VII.")

The defense is available to an employer for claims of harassment based on the actions of a supervisor if the employer establishes that (1) it took reasonable steps to prevent and promptly correct sexual harassment in the workplace, and (2) the aggrieved employee unreasonably failed to take advantage of the employer's preventive or corrective measures. Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1296-97 (11th Cir. 2000) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ).