[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11872
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cv-00789-CC

RODDIE MELVIN,

Plaintiff-Appellant,

versus

FEDERAL EXPRESS CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(May 21, 2020)

Before ROSENBAUM, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

Roddie Melvin appeals the district court's grant of summary judgment in favor of his former employer, Federal Express Co. ("FedEx"), on his age-discrimination and retaliation claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), (d).  On appeal, Melvin argues that he created a "convincing mosaic" of circumstantial evidence showing that FedEx terminated his employment because of his age.  He also argues that he established a *prima facie* case of retaliation and that FedEx's justifications were pretextual.  After careful review, we affirm.

## I.

For purposes of reviewing the district court's grant of summary judgment, we present the facts in the light most favorable to Melvin and resolve all factual disputes in his favor.  *See Alston v. Swarbrick*, 954 F.3d 1312, 1317 (11th Cir. 2020).

At the time of his termination, Melvin, an African-American man over forty years old, had been working for FedEx for thirty-three years.  Nearly thirty of those years were spent in a management role, during which time he received several promotions and merit awards and worked at FedEx facilities around the country.

From 2006 until his termination in November 2016, Melvin was a managing director based in Atlanta.  He oversaw one of four districts within the southern region of FedEx's Air Ground Freight Services Division ("AGFS") and supervised eight senior managers, who in turn supervised various operations managers.  Over that

2

time, Melvin reported to three successive vice presidents: Reginald Owens, Sr., Ricky Brock, and Joseph Stephens. Stephens became vice president of the southern region in April 2016 after Brock retired.

Before being supervised by Stephens, Melvin had received two disciplinary letters at FedEx. The first letter came in 2008 from Owens, who issued it for failing to communicate critical information—damage to aircraft—to Owens and upper management. Then, on August 12, 2015, Brock issued Melvin written discipline for poor judgment and failing to meet established standards. As an "example of [his] poor judgment," the letter stated Melvin acted "directly in violation of [Brock's] instruction" with regard to ramp security and his personal vehicle. According to Brock's testimony, Melvin had continued to park his personal vehicle inside the secure area at the airport after Brock told him not to do so. Brock also cited Melvin's "failure to communicate major exceptions," which referred to issues like flight delays or mishandled packages.

Despite this discipline, both vice presidents thought favorably of Melvin. Owens testified that Melvin was a "sound director" who "ran a good ship" and "took care of business." Brock testified that Melvin was respected by his peers, that he was receptive to changing his style and approach to leadership, and that, after the August 2015 disciplinary letter, Melvin was on a path to correction, not a path to termination.

But that changed with Stephens.  In May 2016, in his first one-on-one conversation with Melvin after becoming his boss, Stephens asked Melvin his age and when he was going to retire.[1]  Stephens wondered if Melvin would "be able to keep up" "given . . . [his] age."  Questioning whether Melvin "really want[ed] to do this job anymore," Stephens suggested he was too old and should "let the young guys do it."  Stephens fired Melvin within six months of this conversation.

On June 16, 2016, Stephens issued Melvin a disciplinary letter for leadership failure.  According to the letter, Melvin falsely reported to Stephens that he had complied with Stephens's instruction to issue corrective action to his management team.  The letter further admonished Melvin for simply forwarding emails from Stephens to his subordinates rather than "taking a sense of ownership and demonstrating a leadership role."

Approximately one month later, on August 11, 2016, Stephens issued Melvin a disciplinary letter for "continued deficiencies with your administrative responsibilities and for failing to anticipate and prevent, or adequately address, several operational issues."  The letter documented several administrative deficiencies which, according to the letter, indicated that Melvin was "approving various activities without proper review" and "delegating without clear instruction

---

[1] Stephens denies making these comments, but we must credit Melvin's testimony for purposes of summary judgment.  *See Alston v. Swarbrick*, 954 F.3d 1312, 1317 (11th Cir. 2020).

and subsequent follow up to ensure proper completion and accuracy." Further, according to the letter, Melvin oversaw several delays and service failures, and an audit showed unacceptable ratings for Melvin's district.

Stephens's original draft of the August 2016 letter terminated Melvin's employment. That was consistent with FedEx policy, which provided that three written notifications of deficiency within a twelve-month period normally results in termination. The August 2016 letter was Melvin's third disciplinary letter within a twelve-month period by one day. After Stephens spoke with FedEx's legal department, the letter was modified to provide that Melvin could retain employment provided he submitted and adhered to a performance-improvement agreement. Thereafter, Melvin and Stephens agreed on a performance-improvement agreement.

Less than 45 days after the August 2016 letter, Stephens spoke with his supervisor, Senior Vice President Michael Pigors, and stated that he wanted to give Melvin a third letter and terminate his employment. Pigors told Stephens that he needed to give Melvin more time and "a chance to fix what he needs to fix." Stephens did not issue a third letter at that time.

On October 27, 2016, Stephens suspended Melvin with pay. Then, eight days after that, on November 3, Stephens issued Melvin a disciplinary/termination letter for insubordination and leadership failure. Stephens listed four reasons for the letter: (1) Melvin allowed Manager Kenneth Baxter to be demoted in violation of

5

Stephens's express direction; (2) Melvin repeatedly parked his personal vehicle in an unapproved location; (3) Melvin failed to report the mishandling of 141 packages on October 12; and (4) Melvin failed to eliminate use of a certain delay code as Stephens had instructed. The letter explained that Melvin's employment was terminated because he had received three letters of deficiency within a twelve-month period.

After his initial conversation with Stephens and after receiving each of the three letters described above, Melvin complained verbally to human resource officials Wanda English and Shannon Brown. In these conversations, Melvin reported Stephens's ageist comments and conveyed his belief that Stephens had intended to get rid of him from the outset due to his age and then began "systemically . . . putting together a list of things" to push him out.

When Melvin first complained to Brown about Stephens's comments, Brown "seemed outraged" and promised that he was "going to be making some calls to follow up to insure that this doesn't happen again." After the June 2016 letter, Brown again promised Melvin that he was going to follow up. In their depositions, however, both Brown and English denied telling Stephens about Melvin's complaints. Stephens testified that he learned that Melvin had complained to Brown after receiving a disciplinary letter, but he denied knowing that Melvin had complained of age discrimination.

6

Melvin filed a charge of discrimination with the Equal Employment Opportunity Commission on November 11, 2016. He also appealed his termination and complained of age discrimination through FedEx's internal processes. FedEx's lead counsel investigated Melvin's complaint and found "no policy violations," concluding that Melvin's allegations were unsubstantiated. The appeals board upheld Melvin's termination in early December 2016. Melvin's replacement was nine years younger than Melvin.

## II.

Melvin sued FedEx in federal court in March 2017, alleging, as relevant here, age discrimination and retaliation under the ADEA, 29 U.S.C. § 623(a)(1), (d).[2] Melvin alleged that Stephens terminated him based on his age and retaliated against him after he complained about Stephens's conduct. After discovery, FedEx filed a motion for summary judgment, which the district court granted in full based on a magistrate judge's report and recommendation. The district court concluded that Melvin had not produced sufficient evidence to rebut FedEx's proffered legitimate, nondiscriminatory reasons for his termination or to show that Stephens was aware of Melvin's complaints of age discrimination when he made the decision to terminate Melvin's employment. Melvin now appeals.

---

[2] On appeal, Melvin does not address his claims of race discrimination and retaliation under 42 U.S.C. § 1981, so we deem these claims abandoned. *See Timson v. Sampson*, 518 F.3d 870, 873 (11th Cir. 2008) (issues not briefed on appeal are deemed abandoned).

## III.

We review the grant of summary judgment *de novo*. *Alston*, 954 F.3d at 1317. "We view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Id.* (quotation marks omitted). Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

At the summary-judgment stage, the judge's function is not to weigh the evidence but to determine if there is a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* Therefore, summary judgment may be granted "[i]f the evidence is merely colorable or is not significantly probative." *Id.* at 249–50 (citations omitted).

## IV.

The ADEA prohibits private employers from firing an employee who is at least 40 years of age "because of" the employee's age. 29 U.S.C. §§ 623(a)(1), 631(a). "[T]he language 'because of' . . . means that a plaintiff must prove that discrimination was the 'but-for' cause of the adverse employment action." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013). This standard is met if the plaintiff's age played a role in the employer's decision-making process and had a

8

determinative influence on the outcome. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

We ordinarily evaluate ADEA claims based on circumstantial evidence, which is what Melvin relies on here, under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Sims*, 704 F.3d at 1333. Alternatively, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

"A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." *Id.* (quotation marks omitted). A plaintiff may establish a "convincing mosaic" with "evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quotation marks omitted).

Melvin contends that he demonstrated such a convincing mosaic with evidence of discriminatory comments by Stephens and of pretext in FedEx's rationale. The question before us, then, is whether Melvin's evidence is sufficient

9

to raise a reasonable inference that FedEx discriminated against him because of his age.[3] *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) ("Whatever form it takes, if the circumstantial evidence is sufficient to raise a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." (quotation marks omitted)).

## A.    *Discriminatory Comments*

Ageist comments that are not direct evidence of discrimination may still "provide circumstantial evidence to support an inference of discrimination." *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998) (discussing racial comments). In *Damon v. Fleming Supermarkets of Florida, Inc.*, for example, we held that a supervisor's comment that he wanted "aggressive, young men" to be promoted was probative as to whether age animus motivated the decision to terminate the plaintiff. 196 F.3d 1354, 1362–63 (11th Cir. 1999). Likewise, in *Alphin v. Sears, Roebuck & Co.*, we stated that a comment by a supervisor that the plaintiff was "too old" "certainly supports a showing of discriminatory intent if we interpret the remark in the light most favorable to Alphin." 940 F.2d 1497, 1501

---

[3] FedEx disputes whether Melvin established a *prima facie* case of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Its arguments on this point, however, relate primarily to its proffered reasons for Melvin's termination and therefore are more appropriately addressed at the pretext stage of the analysis. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). In any case, even assuming FedEx is correct that Melvin failed to create a *prima facie* case, we would still analyze whether he created a triable issue of discrimination based on a "convincing mosaic" theory, which, at least in this case, is largely indistinguishable from our ordinary pretext analysis.

10

(11th Cir. 1991); *see also Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204–05 (11th Cir. 2010) (comments by a supervisor that a plaintiff is "too old" can be circumstantial evidence of age discrimination).

Here, we agree with Melvin that Stephens's ageist remarks to him, if credited, are probative as to whether age animus motivated the decision to terminate his employment. *See Damon*, 196 F.3d at 1362–63. According to Melvin, Stephens pressured him to resign in their first one-on-one meeting because of his age, questioning whether he "wanted to continue to do this" "given . . . [his] age" and stating that he should "let the young guys do it." Approximately one month after this conversation, Stephens issued Melvin a disciplinary letter. And within six months of this conversation, Stephens fired him. Given the "substance, context, and timing" of the comments, *id.* at 1362, they "certainly support[] a showing of discriminatory intent if we interpret the remark[s] in the light most favorable to [Melvin]," *Alphin*, 940 F.2d at 1501.

Nevertheless, the comments alone are not sufficient to meet Melvin's burden of creating a triable issue of discriminatory intent, nor do we understand Melvin to argue as much. *E.g.*, *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1309 (11th Cir. 2007) ("Crawford erroneously argues that evidence of a discriminatory animus allows a plaintiff to establish pretext without rebutting each of the proffered reasons of the employer."). In *Damon*, for example, the plaintiff presented additional

11

evidence demonstrating that the employer's proffered reasons were pretextual, which, when combined with the discriminatory comments, was enough to create a triable issue of discrimination. *See Damon*, 196 F.3d at 1363 ("[A] reasonable jury could conclude that the specific reasons for termination given by Fleming were a pretext."); *see also Alphin*, 940 F.2d at 1501 (finding that other evidence of pretext, combined with the discriminatory comment, created a triable issue of discrimination). Accordingly, we consider the ageist remarks along with Melvin's other pretext evidence to determine whether there is a triable issue of discrimination.

## B.    *Pretext in Employer's Rationale*

A plaintiff may create an inference of discriminatory intent "by showing that [the employer's] proffered reasons are not credible." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). To show than an employer's reason is not credible, the plaintiff "must meet that reason head on and rebut it," *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*), demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale." *Holland v. Gee*, 677 F.3d 1047, 1055-56 (11th Cir. 2012) (quotation marks omitted). But plaintiffs may not recast the reason or merely quarrel with its wisdom. *Chapman*, 229 F.3d at 1030. It is not our role to second-guess the business decisions of employers. *Id.* Our concern is whether an employment decision was motivated by unlawful discriminatory animus,

12

not whether the decision was prudent or fair, and we limit ourselves "to whether the employer gave an honest explanation of its behavior." *Id.* (quotation marks omitted).

FedEx claims that it terminated Melvin's employment because of a pattern of insubordination and leadership failure, as documented in the three disciplinary letters Stephens issued Melvin. Melvin's deficiencies, according to FedEx, included administrative failures, insubordination, failure to manage his subordinates, and failure to timely notify Stephens of important matters. FedEx further argues that Melvin had been disciplined for similar deficiencies before Stephens became his supervisor. Melvin maintains that a jury could conclude that FedEx's proffered reasons—as reflected in the three disciplinary letters issued by Stephens—were pretextual.[4]

1.    June 16, 2016, Letter

The June 16, 2016, disciplinary letter related to various past-due administrative matters that were pending when Stephens became vice president of the southern region. Early in his tenure, Stephens issued guidance to his managing directors that he expected them to bring their districts up to date and to counsel their

---

[4] In several footnotes, Melvin makes conclusory assertions that the district court violated Rule 56(f)(2), Fed. R. Civ. P., by granting summary judgment on a ground not presented in FedEx's motion for summary judgment. But these passing references are insufficient to raise that issue for appeal. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."). Nor do we believe the court went beyond the grounds raised by FedEx.

13

senior managers that timely compliance would be enforced with more severe discipline going forward. According to Stephens, he instructed the managing directors "to make sure that everyone gets a documented OLCC"—a form of written counseling—"that if this happens again in the future, you will receive discipline up to and including termination," and gave them a deadline of May 31. On or around May 18, Melvin wrote him a memorandum stating that everything had been taken care of. Stephens asked his assistant to take a closer look, and "what he said was completed, was not completed." Giving Melvin the "[b]enefit of the doubt," Stephens waited a couple weeks and checked again, but it was "[s]till not done." At that point, Stephens testified, he decided to discipline Melvin for failing to comply with Stephens's instruction and mispresenting that he had done so.

Melvin has not shown pretext with respect to this issue. The record shows that Melvin sent Stephens a memorandum on May 18, 2016, documenting the corrective actions that had been taken for all past-due items. Further, Melvin testified that he relied on his senior managers to issue written counseling to their subordinates but later learned that his senior managers "had not issued the written counseling." In order words, Melvin effectively admitted that his May 18 memorandum to Stephens was not accurate.

Nor was it unreasonable for Stephens to hold Melvin responsible for the inaccurate memorandum and the failure of his subordinates. Given that Stephens

14

and his assistant were able to review whether the memorandum was accurate, there appears to be no reason Melvin could not have done the same thing before submitting it to Stephens.  And while Melvin claims that other managing directors also had past-due matters and were not disciplined, the evidence is undisputed that the other managing directors got their districts up to date and accurately reported doing so. Accordingly, Melvin has not demonstrated pretext with respect to this matter.

2.    August 11, 2016, Letter

The August 11, 2016, letter disciplined Melvin for "continued deficiencies with [his] administrative responsibilities and for failing to anticipate and present, or adequately address, several operational issues."  The letter documented several administrative deficiencies which, according to the letter, indicated that Melvin was "approving various activities without proper review" and "delegating without clear instruction and subsequent follow up to ensure proper completion and accuracy." These included inaccurate travel and expense reports and an inaccurate requisition for extra staff.  Further, according to the letter, Melvin oversaw several delays and service failures and failed to timely record an injury, and an audit showed unacceptable ratings for Melvin's district.

Melvin contends that the matters identified in the letter did not warrant discipline and that there is a factual dispute as to the frequency of his paperwork errors.  But while Melvin believed that his error rate was lower than that of other

managing directors in the southern region, there is no evidence that another managing director had similar errors during the same time period and was not disciplined, let alone that another managing director who had recently been disciplined for delegating without clear instruction and failing to ensure proper completion and accuracy had been.  Nor does Melvin even address the various other matters identified in the August 2016 letter.  He essentially argues that Stephens's expectations were unreasonable and unfair, but that is not enough to establish a violation of the ADEA, *see Chapman*, 229 F.3d at 1030, and he presents no evidence from which a reasonable jury could conclude that the manifold issues listed in the August 2016 letter were false or pretextual.

3.    November 3, 2016, Letter

Stephens listed four reasons for issuing the November 2016 letter terminating Melvin's employment.  We address each in turn.

**Demotion of Ken Baxter**

The November 2016 letter first asserts that Melvin violated Stephens's express instruction not to demote Baxter by permitting one of his senior managers to demote Baxter and "place him on a 90 day [personal leave of absence] dated September 11, 2016."  Stephens testified that Melvin took it upon himself to demote Baxter, without involving human resources, in violation of both Stephens's express direction and FedEx policy.

16

In the light most favorable to Melvin, the relevant context is as follows. Baxter was a South Carolina operations manager within Melvin's district who wanted to transfer to Indianapolis, where his wife had recently moved. After bidding unsuccessfully on management positions in Indianapolis, Baxter began applying for hourly positions. But because of the way FedEx categorizes employees, Baxter was always ranked lower than other applicants who were hourly employees. On August 26, 2016, Baxter emailed his senior manager, Fred Laskovics, to ask for help. Laskovics forwarded the email to George Sims, the human-resources personnel representative for that region, who responded, copying Melvin, that Baxter needed to request a "step down from his current position and be placed in an open Handler or Material position. He can then be placed on [leave of absence] from here."

Melvin discussed the matter with Stephens, who said he would help facilitate the transfer and that someone from Indianapolis would be sending a "PCN" number to enable Baxter to make the move. Stephens told Melvin not to demote Baxter in the meantime. Melvin waited three or four weeks without hearing anything.

Meanwhile, Laskovics met with Baxter to go over Sims's instructions, and Baxter said he would apply for an hourly position in South Carolina and then request a personal leave of absence to apply for jobs in Indianapolis. Baxter then did so and, as the only applicant for the position, was hired as an hourly employee on September 11, 2016. Baxter also completed paperwork to request a personal leave of absence,

17

which Melvin granted.  Neither Melvin nor Laskovics demoted Baxter, according to Laskovics.

In mid-September 2016, Stephens emailed Melvin and informed him that Baxter was applying for management positions and, despite his prior statements to Laskovics, was not interested in a handler position.  Stephens wrote, "This is why I explicitly advised you NOT to simply demote and place this individual on a PLOA.  He's not bidding on Handler or Material Handler positions, despite how you handled.  In your situation, I don't understand why you wouldn't comply with my direction back on 09/01."  Melvin wrote back that "this guy has cost me more than you know" and that he was simply trying to help Baxter and "thought [he] was doing the right thing."

Melvin testified that soon after, he and Stephens spoke, and Melvin explained what had happened and why.  Stephens said he understood what Melvin had done and that he was "okay with it," and he did not give "any counseling other than to say let's make sure this doesn't happen again."  Stephens did not "state or imply that [Melvin] had been insubordinate or that [he] had committed a discipline-worthy offense."

We conclude that Melvin has not shown pretext as to the Baxter matter.  To be sure, Melvin presented some evidence to contradict the factual grounds asserted by Stephens.  Testimony from Melvin and Laskovics, the senior manager most

18

directly involved with the Baxter matter, established that Melvin and Laskovics received and followed guidance from human resources about Baxter's transfer request, did not demote Baxter, and granted a leave of absence only after Baxter had, consistent with FedEx policy, bid on and been hired for a handler position in South Carolina. Further, Stephens testified that it was not inappropriate for a managing director to grant a leave of absence requested by an employee.

Despite this evidence, we agree with the district court's reasoning that, even if Stephens was mistaken as to the actual facts of what happened with Baxter, there was "no evidence to refute that Stephens had an honest, good-faith belief that [Melvin] had violated his directive not to demote Baxter." *See Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of [discrimination].'").

On September 14, 2016, Stephens wrote an email accusing Melvin of disregarding his direction not to demote Baxter. There is no evidence that, at the time he sent the email, he did not in good faith believe that accusation. Further, we agree with the district court that "there is no evidence that Stephens was aware Baxter independently applied for the hourly position in Columbia, South Carolina." In response, Melvin points to his testimony that, after the September 14 email, he spoke with Stephens and explained what had happened, and Stephens said he

19

understood and was "okay with it." But the court persuasively explained that Melvin

could not have told Stephens how Baxter got into an hourly position because Melvin

did not know those facts until Laskovics's deposition for this case. And Melvin's

mere denial to Stephens—that he did not demote Baxter—is not enough, where there

is no evidence that Stephens learned of information to corroborate that denial.

Accordingly, Melvin has not established pretext with regard to the Baxter matter.[5]

**Unapproved Parking**

The November 2016 termination letter next asserted that, despite being

"advised by both Corporate Security and VP Brock that [he] w[as] not permitted to

park inside the perimeter fence at the FOPRT facility," Melvin continued to park his

personal vehicle "in the unapproved location."

Undisputed record evidence shows that, in August 2015, Melvin's prior

supervisor, Brock, issued a letter disciplining Melvin for "creat[ing] direction to

security that was directly in violation of [Brock's] instruction" with regard to ramp

security and his personal vehicle. Brock testified that the discipline was based on

Melvin's parking of his car inside the secure area after Brock told him not to do so.

Then, on September 20, 2016, Stephens received an email from Katina Burchfield,

---

[5] We do not consider the October 27, 2016, email Stephens received from George Sims, in which Sims wrote that Melvin had admitted to Sims that he violated Stephens's instruction not to demote Baxter. Because there was evidence that Stephens had decided to terminate Melvin's employment by mid-October, a reasonable jury could conclude that any information learned by Stephens on or after that date played no role in the employment decision.

the managing director of security, memorializing a conversation between her and Stephens a few days earlier.  According to the email, Burchfield had called Stephens to discuss "unauthorized employee parking."  Burchfield reported that Melvin had been parking his personal vehicle inside the secure area, and that when confronted by another security employee, Melvin had stated that "he would discontinue."  Yet as indicated in the November 2016 termination letter, Melvin parked his personal vehicle in the secure area nine additional times in less than a two-month period.

Melvin has not demonstrated pretext with regard to this issue.  Melvin claims that he followed all appropriate parking rules and parked inside the security fence only with permission from security.  But at best he has shown that security was internally conflicted as to the appropriateness of Melvin's parking of his personal vehicle inside the secure area.  And it remains undisputed that Melvin was disciplined for disregarding the instruction of his direct supervisor not to park in the secure area, that no other supervisor had told Melvin he could park in the secure area, and that, according to the email Stephens received, Melvin continued to park in the secure area even after telling security he "would discontinue."  Accordingly, Melvin's evidence is insufficient to show that his unauthorized parking was a false reason or a pretext for discrimination.

21

**Mishandling of Packages**

Third, according to the November 2016 letter, Melvin failed to report to the Regional Office the mishandling of 141 packages, and when questioned about why it was not reported, Melvin did not know the full impact, was unaware of the root cause, and claimed that "[he] didn't think it was any big deal."

Melvin denies claiming that it was not a big deal, but he has not otherwise shown that this reason was false or pretextual. While Plaintiff essentially blames a subordinate manager for failing to report the incident to Stephens and states that he explained to Stephens that this manager was responsible for that failure to report, he does not dispute that the service failure was not promptly reported by him or one of his subordinates. The fact that Stephens held Melvin responsible for the failure to report the exception that occurred within his region is a business decision and is not evidence of pretext. *See Chapman*, 229 F.3d at 1030. Melvin presents no evidence of a comparator who was treated more favorably for the same conduct. We also note that Melvin's prior supervisors raised similar issues with his performance, and that Melvin was disciplined in 2008 for failing to report a service failure. Accordingly, Melvin has not shown pretext as to this issue.

**Use of Delay Code**

Finally, the November 2016 letter states that, despite instructions to "discontinue the application of the TD delay code due to the excessive use identified

22

in [his] District (97 of 1,420 flights or 6.83% of all departures)," Melvin's district "continued to utilize the TD delay code 19 more times on 268 flights or 7.09% of all departures; actually increasing the frequency of use."

The relevant context is this. FedEx used various codes to classify the cause of flight delays. The "TD" code was used to note a delay caused by a discrepancy between the pilot's clock and the ramp's clock. At some point, FedEx adopted a new time-keeping system that was intended to synchronize employees' clocks and eliminate time discrepancies.

Stephens testified that, in light of the new system, he instructed his managing directors to eliminate usage of the TD delay code and to more accurately code the specific issue—such as weather, crew, etc.—that caused a delay. He stated that Melvin's district was using the TD delay code excessively and that the high rate of use was "covering up an operational deficiency." Melvin argues that Stephens never instructed him to eliminate usage of the code immediately. Rather, the instruction was to reduce it, and Stephens, according to Melvin, understood this to be Melvin's understanding.

Melvin has not shown pretext as to this issue. Even assuming Stephens instructed his managing directors to reduce, rather than eliminate, use of the code, and that some use of the code remained necessary, Stephens explained in the warning/termination letter that Melvin's district had actually increased the frequency

23

of use of the TD delay code. Melvin points to no evidence creating a genuine issue of material fact concerning whether his district increased the use of that code. Nor does he identify evidence suggesting that the other managing directors under Stephens were unable to reduce use of the TD delay code within their districts, or that another managing director was not disciplined despite overseeing an increase in its use. So even in the light most favorable to Melvin, the undisputed evidence still shows that Melvin failed to implement Stephens's instructions. Accordingly, there is no genuine issue to go before a jury relating to the TD delay code.

*C.*    *Conclusion*

Although Melvin has presented some evidence that Stephens, his supervisor, made ageist remarks to him within six months of his termination, he has not established pretext in FedEx's rationale for the termination decision. We therefore conclude that Melvin has not presented sufficient circumstantial evidence for a reasonable jury to conclude that his age was a "but-for" cause of the termination decision. *See Gross*, 557 U.S. at 176; *Sims*, 704 F.3d at 1332–33; *see also Crawford*, 482 F.3d at 1309. Accordingly, we affirm the district court's grant of summary judgment on Melvin's claim of age discrimination.

**V.**

Turning to Melvin's retaliation claim, the ADEA prohibits private employers from retaliating against employees who "opposed any practice" made unlawful by

24

the ADEA. 29 U.S.C. § 623(d). To succeed on a retaliation claim, the plaintiff must prove a causal connection between his protected activity and the alleged retaliatory conduct. *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). This generally requires a showing "that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). That requirement rests on the common-sense notion that "[a] decision maker cannot have been motivated to retaliate by something unknown to him." *Id.*

Therefore, even in cases where there is temporal proximity between the protected conduct and the adverse employment action, that proximity "alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Id.* In other words, when there is "unrefuted testimony of the decision maker that he knew nothing of the protected conduct," temporal proximity alone is not a sufficient basis to allow a factfinder to decide "that the decision maker is lying." *Id.* Nor can knowledge held by other corporate officers be imputed either to the corporation or to the decision maker. *Id.*

Here, the district court properly granted summary judgment on Melvin's retaliation claim. Stephens, the decision maker, provided unrefuted testimony that he knew nothing about Melvin's complaints of age discrimination until after this

lawsuit was filed.  In addition, English and Brown, the human-resources officials to whom Melvin complained about Stephens, testified that they did not tell Stephens about Melvin's complaints.   While Melvin maintains that a jury could infer Stephens's knowledge of Melvin's complaints of age discrimination from the timing of Stephens's disciplinary actions, we cannot, in light of Stephens's unrefuted testimony, submit the issue to the jury based on temporal proximity alone.  *See id.* Nor can English's or Brown's knowledge be imputed either to Stephens or FedEx. *See id.*   Accordingly, Melvin has not presented sufficient evidence of a causal connection to withstand summary judgment.

## VI.

In sum, we affirm the entry of summary judgment in favor of FedEx on Melvin's claims of age discrimination and retaliation.

**AFFIRMED.**