[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11494

Non-Argument Calendar

_____

GREGORY MINARD,

Plaintiff-Appellant,

*versus*

SAM'S EAST, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:18-cv-01222-AKK

_____

Before JILL PRYOR, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Gregory Minard accuses Sam's East, Inc. of unlawfully terminating him because of his race or because of his age. Although he admits that he violated company policy, he argues that younger Caucasian employees did the same thing and suffered no consequences. The district court granted summary judgment to Sam's East, concluding that Minard failed to show that his employer acted with discriminatory intent. We affirm.

## I.

Gregory Minard, a 57-year-old African American man, became the manager of the Sam's Club in Irondale, Alabama in 2003. During his fourteen years in the role Minard "routinely received raises, recognition for exceptional store performance, and positive annual reviews." Although he developed a strong record, it was not flawless; on at least two occasions Minard received disciplinary warnings from his manager for failing to ensure that his store was properly stocked and organized. Along with overseeing in-store sales, Club managers like Minard were tasked with helping to facilitate large wholesale purchases by Club members. Minard's most notable success came through these sales by the truckload.

For Minard, the sales began in 2012 when a local food distributor came to him hoping to order an enormous amount of french fries. Back then Minard was largely unfamiliar with the

wholesale process, so he contacted the Vice President of Wholesale Trading, Don Mills, for help. Mills told Minard, among other things, to have the distributor prepay for the fries by ringing up the order on the register. Minard followed the instructions, and it seemed to work well. Minard also went out of his way to make truckload ordering easy for his members. Sometimes he or a trusted employee would pick up a member's credit card to charge them for an order, saving them the trip to the store. Within a few years, Minard's store was grossing over two million dollars annually in truckload sales. Because of his success, Minard's manager even asked him to help neighboring Sam's Clubs expand their wholesale business.

But the prepayment process Minard used had a flaw. Ringing up a truckload order immediately deducted the items from the store's inventory, causing the inventory total to drop far below the actual number of items in the store. And a big enough order could drop the store's count into the negatives. In 2015 Sam's Club solved this problem with a truckload prepayment policy, prohibiting stores from ringing them up at the register. The policy instructed employees to use a special deposit account to hold the prepaid funds until the truckload shipment arrived at the store. Only at that point were they to ring up the sale.

Anyone who failed to follow the policy risked discipline because under another policy recording "sales or returns that were not actually made, or where the merchandise had not yet been delivered when the sale was registered" constituted a "financial

integrity" violation.  Minard, however, failed to adopt the deposit account process and continued to ring up truckload orders.

Minard's store began to suffer inventory problems in late 2016 or early 2017 when his french fry supplier suffered shortages and couldn't meet the wholesale demand.  Minard was forced to refund prepayments for orders he couldn't fulfill, but even after those refunds the inventory system indicated a "negative on-hands" count.  Because the system had processed more sales of fries than had been delivered to the store, that meant members had paid for fries they never received.  Minard discussed the problem with the Market Asset Protection Manager, Melanie Patrick, as well as his manager, Marshall Bacote.  Minard also worked with his members directly to try to determine whose orders had not been fulfilled.  After several months of review, the inventory error remained unsolved.

Then Athena Rushforth replaced Patrick as the Market Asset Protection Manager, and when she learned about the discrepancy while visiting the store in July 2017 she became concerned.  Minard was not at the store that day, so the next week Rushforth, Minard, and two others joined a conference call to discuss the issue.  On the call Minard explained how he had been pre-ringing the sales and, in some cases, using a member's credit card without the person present; Rushforth explained to him that this process violated company policy.

Based on this information Rushforth escalated the issue within the Asset Protection group to Hugh Zengerle, who in turn

requested an investigation by the company's Ethics team. Rushforth was assigned to spearhead the investigation, and she confirmed that Minard's actions violated company policy and had created a "financial integrity issue." Because Minard already had two written warnings, both Ethics and HR approved Minard's termination. His manager fired him a few days later.

As a result, responsibility for the store's truckload sales shifted to Nadine Smith, a 29-year-old Caucasian woman who had been Minard's assistant manager. Smith had been assisting Minard with all aspects of truckload orders for some time. She was one of the few employees permitted to pick up members' credit cards, and like Minard she had pre-rung wholesale purchases weeks before the items arrived. After Minard was fired, Smith continued to pre-ring truckload orders using members' credit cards, which again caused the store's french fry inventory to drop into the negatives. This led to a second Ethics investigation, again led by Rushforth and Zengerle. Rushforth concluded that Smith had merely been following Minard's directions, so Smith was re-trained but not disciplined. Sam's Club closed the Irondale store not long after, and the truckload members were directed to the nearby Trussville, Alabama location.

The Trussville Sam's Club was managed by Elizabeth Bowler, a 50-year-old Caucasian woman. Bowler fulfilled these orders like Minard did—by pre-ringing the sales—though she would wait until a few days before the items arrived rather than ringing up the order the moment it was placed. At Trussville the

transactions never triggered the complex inventory problem that they had at Irondale, so Bowler's process went unnoticed for some time. When Sam's Club eventually learned that Bowler was not following company policy, HR concluded that Bowler needed "training" and so "provided documentation" about the special prepayment account. But the company did not discipline Bowler.

Minard sued, claiming that Sam's Club had unlawfully discriminated against him because of his age and race—and did so in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the federal Age Discrimination in Employment Act, and the Alabama Age Discrimination in Employment Act.[1] *See* 42 U.S.C. § 2000e-2; 29 U.S.C. § 623; Ala. Code § 25-1-22. The district court granted summary judgment to Sam's Club, concluding that Minard failed to prove that Sam's Club acted with discriminatory intent, in part because he compared himself to employees who were not "similarly situated" to him. Minard appeals.

## II.

We review a grant of summary judgment de novo, "construing all facts and drawing all reasonable inferences in favor of the nonmoving party." *Jefferson v. Sewon Am., Inc.*, 891 F.3d

---

[1] Minard also brought two state law claims: a negligent hiring, training, supervision, and retention claim and an outrage claim. But he abandoned them both by failing to argue them on appeal; his cursory discussion of the negligent hiring claim in his initial brief is not enough. *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

911, 919 (11th Cir. 2018) (citation omitted).  Summary judgment is appropriate when the moving party is entitled to a judgment as a matter of law.  *Cantu v. City of Dothan*, 974 F.3d 1217, 1228 (11th Cir. 2020).

## III.

Under Title VII and 42 U.S.C. § 1981, it is unlawful to terminate an employee because of his race.  *See Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc).  Nor can race be "a motivating factor for an adverse employment action," even if "other factors also motivated the action."  *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (citing 42 U.S.C. § 2000e–2(m)) (quotation omitted).  *But see Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (holding that the Title VII motivating factor test does not extend to § 1981).  The ADEA prohibits employers from firing employees because of age, but unlike Title VII it does not authorize "mixed-motive" age discrimination claims.  *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1203–04 (11th Cir. 2010).

At summary judgment, the employee must produce sufficient evidence to show that the employer acted with discriminatory intent.  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  He may satisfy this burden using either direct or circumstantial evidence, including by relying on the *McDonnell Douglas* framework.  *See Lewis*, 918 F.3d at 1220 (Title VII and § 1981 claims); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332

(11th Cir. 2013) (ADEA claims); *Robinson v. Alabama Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007) (Alabama age discrimination law mirrors ADEA).

Minard argues that the company's decision to fire him but not two younger white employees who also violated company policy is sufficient circumstantial evidence of intentional discrimination. He relies on the *McDonnell Douglas* burden-shifting framework, which requires the employee to make out an initial "*prima facie* case of discrimination." *See Lewis*, 918 F.3d at 1220–21. If an employee produces a prima facie case, the employer must produce "a legitimate, nondiscriminatory reason for its actions." *Id.* Then the employee must show that any proffered reason "was merely a pretext," for the "ultimate burden" of persuasion is always on the employee to establish that he was "the victim of intentional discrimination." *Id.* (quotation omitted).

To establish the prima facie case of discrimination, Minard must show (1) that he belongs to a protected class, (2) that he suffered an adverse employment action, (3) that he was qualified for the job, and (4) that his employer treated "similarly situated" employees outside his class more favorably. *See id.* The parties agree that Minard satisfies the first three elements, but they dispute the fourth. Minard claims that both Smith and Bowler were "similarly situated" because both pre-rang truckload orders and because Smith used members' credit cards. And despite these similarities, he argues, Sam's Club only disciplined and terminated him.

Another employee is "similarly situated" to a plaintiff only when she is similar in "all material respects," meaning she "cannot reasonably be distinguished." *Id.* at 1227–28 (quotation omitted). In this analysis we often consider whether she (1) "engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) was subjected "to the same employment policy, guideline, or rule"; (3) was managed by the same supervisor; and (4) shared "the plaintiff's employment or disciplinary history." *Id.*

Based on these characteristics neither Smith nor Bowler was similarly situated to Minard. Unlike Minard, Bowler never directed her staff to borrow members' credit cards to pay for truckload orders at the store. And even though she pre-rang wholesale orders for a year, this never led to an unresolvable negative inventory problem. Minard also had two written disciplinary warnings, but both Bowler's and Smith's records were clean. Now it's true that Smith was more like Minard than Bowler in that she also misused members' credit cards, but on the other hand Smith was not a Club manager. In fact, she had been Minard's assistant manager; it therefore was reasonable for Sam's Club to attribute more of the responsibility to her superior, Minard. These material distinctions show that neither Bowler nor Smith was similarly situated to Minard.

The record is also devoid of direct evidence that Sam's Club acted with discriminatory intent, and the other remaining bits of evidence do not form a "convincing mosaic" from which a jury could infer intentional discrimination. *See Lockheed-Martin*, 644

F.3d at 1328.  Minard argues that Rushforth purposefully avoided him "as a black African American" and selectively worked with the younger "white female" employees at the store.  But Minard was not working when Rushforth first visited his club in July 2017, the day she learned of the inventory problem.  And on the follow-up conference call a few days later Minard admitted to her that he had not been following the company policy for truckload sales.  Then Rushforth was tasked with a central role in the "financial integrity" investigation Sam's Club opened a few weeks later.  Although this evidence shows that Rushforth investigated a perplexing inventory problem that Minard caused by mishandling truckload orders, it does not add up to racial discrimination.[2]

\*        \*        \*

The issue here is not whether it was a wise business decision to fire Minard despite his years of hard work and his success garnering truckload sales.  Sam's Club may "fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  See Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984), abrogated on other grounds by Lewis,

---

[2] Minard's direct evidence of age discrimination is also inadequate.  He points to an offhand comment by a speaker at an annual company meeting that "if you were writing with paper and pencil instead of taking notes on a tablet or a phone, then you were kind of like a dinosaur."  This tangential "evidence is too weak to raise a genuine fact issue."  See Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1267–68 (11th Cir. 2010).

21-11494                Opinion of the Court                11

918 F.3d at 1218.  Because Minard fails to show that Sam's Club acted with discriminatory intent, his race and age discrimination claims cannot succeed.

**AFFIRMED.**